## Commonwealth *v.* Fisher, Appellant.

*Constitutional law—Title of statute—Courts—Juvenile court—Trial by jury —Class legislation—Act of April 23, 1903, P. L. 274.*

The Act of April 23, 1903, P. L. 274, entitled an act "Defining the powers of the several courts of quarter sessions of the peace, within this commonwealth, with reference to the care, treatment and control of dependent, neglected, incorrigible and delinquent children, under the age of sixteen years and providing for the means in which such power may be exercised," is constitutional. The act is sufficient in title, and does not contain more than one subject. It does not create a new court; nor does it deprive juveniles charged with crime of their constitutional right of trial by jury; nor is it class legislation.

Argued May 9, 1905. Appeal, No. 44, Jan. T., 1905, by defendant, from judgment of Superior Court, Oct. T., 1904, No. 69, affirming judgment of Q. S. Phila. Co., delinquent certificate, No. 645, committing defendant to house of refuge in case of Commonwealth v. Frank Fisher. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT and ELKIN, JJ. Affirmed.

Appeal from Superior Court.

*Error assigned* was the judgment of the Superior Court.

*John H. Fow*, for appellant.

*John C. Bell*, district attorney, with him *Owen J. Roberts*, assistant district attorney, for appellee.

OPINION BY MR. JUSTICE BROWN, October 9, 1905:

In a proceeding conducted in the court of quarter sessions of the county of Philadelphia under the provisions of the Act of April 23, 1903, P. L. 274, Frank Fisher, the appellant, was committed by that court to the House of Refuge. From the order so committing him an appeal was taken to the Superior Court, which affirmed it: Commonwealth v. Fisher, 27 Pa. Superior Ct. 175. The constitutionality of the act of 1903 was the sole question before the court in that case, and is renewed here. The objections of the appellant to the constitutionality of the act, as presented by counsel, are : (*a*) Under its provisions the defendant was not taken into court by due process of law; (*b*) he was denied his right of trial before a jury on the charge of the felony for which he had been arrested; (*c*) the tribunal before which he appeared and which heard the case and committed him to the house of refuge was an unconstitutional body and without jurisdiction; (*d*) the act provides different punishments for the same offense by a classification of individuals according to age; (*e*) the act contains more subjects than one, some of which are not expressed in the title. In considering these objections the order in which they are made will not be followed.

The act is entitled : " An act defining the powers of the several courts of quarter sessions of the peace, within this commonwealth, with reference to the care, treatment and control of dependent, neglected, incorrigible and delinquent children, under the age of sixteen years, and providing for the means in which such power may be exercised." By this title notice of the purpose of the act is distinctly given. It is a single one. It is to define what powers the state, as the general guardian of all of its children, commits to the several courts of quarter sessions in exercising special guardianship over children under the age of sixteen years needing the substitution of its guar-

dianship for that of parents or others. This purpose is expressed in the title in as few words as are consistent with clearness. No one from reading the title can possibly misunderstand the purpose of the act that follows, and Art. III, sec. 3, of the constitution is not offended, if, in passing to the body of the act, nothing is there found. but this one single purpose. The preamble to it is a recital that, as the welfare of the state requires that children should be guarded from association and contact with crime and criminals, and as those who, from want of proper parental care or guardianship, may become liable to penalties which ought not to be imposed upon them, it is important that the powers of the court, in respect to the care, treatment and control of dependent, neglected, delinquent and incorrigible children should be clearly distinguished from those exercised by it in the administration of the criminal law. After defining the powers of the court the act proceeds to direct how they are to be exercised in giving effect to its purpose. Nothing in the first nine sections can be read as relating or germane to any other purpose than the one named; and there can be no surer test than this of compliance with the constitutional requirement of the singleness of purpose of an act of assembly.

The objection that "the act offends against a constitutional provision in creating, by its terms, different punishments for the same offense by a classification of individuals," overlooks the fact, hereafter to be noticed, that it is not for the punishment of offenders, but for the salvation of children, and points out the way by which the state undertakes to save, not particular children of a special class, but all children under a certain age, whose salvation may become the duty of the state in the absence of proper parental care or disregard of it by wayward children. No child under the age of sixteen years is excluded from its beneficent provisions: Its protecting arm is for all who have not attained that age and who may need its protection. It is for all children of the same class. That minors may be classified for their best interests and the public welfare, has never been questioned in the legislation relating to them. Under the act of 1887, the classification of females under sixteen years of age means felonious rape, with its severe penalties for what may be done one day, though on the next

it remains simple fornication, to be expiated by a mere fine. Other acts forbid the employment of minors under twelve years of age in mills ; of any boy under fourteen or any female in anthracite coal mines; of minors under fourteen in and about elevators ; of a boy under twelve or any female in bituminous coal mines ; others make it a misdemeanor to furnish intoxicating drinks, by sale, gift or otherwise, to one under twenty-one, and forbid the admission of any minor into certain places of amusement. Such classification is not prohibited by the constitution, and what has not been therein prohibited the legislature may enact. Shortly after the adoption of our present constitution we said, in the leading case Wheeler v. The City of Philadelphia, 77 Pa. 338 : "In like manner other subjects, trades, occupations, and professions, may be classified. And not only things but persons may be so divided. The genus homo is a subject within the meaning of the constitution. Will it be contended that as to this there can be no classification ? No laws affecting the personal and property rights of minors as distinguished from adults ? Or of males as distinguished from females ? Or, in the case of the latter, no distinction between a feme covert and a single woman ? What becomes of all our legislation in regard to the rights of married women if there can be no classification? and where is the power to provide any future safeguards for their separate estate? These illustrations might be multiplied indefinitely were it necessary."

No new court is created by the act under consideration. In its title it is called an act to define the powers of an already existing and ancient court. In caring for the neglected or unfortunate children of the commonwealth, and in defining the powers to be exercised by that court in connection with these children, recognized by the state as its wards requiring its care and protection, jurisdiction is conferred upon that court as the appropriate one, and not upon a new one created by the act. The court of quarter sessions is not simply a criminal court. The constitution recognizes it, but says nothing as to its jurisdiction. Its existence antedates our colonial times, and, by the common law and statutes, both here and in England, it has for generations been a court of broad general police powers in no way connected with its criminal jurisdiction. Innumerable

statutes upon our own books during the last two centuries attest this.    With its jurisdiction unrestricted by the constitution, it is for the legislature to declare what shall be exercised by it as a general police court, and instead of creating a distinctively new court, the act of 1903 does nothing more than confer additional powers upon the old court and clearly define them.    On this point nothing can be profitably added to the following from the opinion of the Superior Court: "No new court is created and the ancient court of quarter sessions, which is older than all the constitutions of Pennsylvania, is given thereby not greater but different powers from those previously exercised.    The court of quarter sessions has for many years exercised jurisdiction over the settlement of paupers, over the relation of a man to his wife and children in desertion cases, in surety of the peace cases, in the granting of liquor licenses, and in very many of the ways in which the public welfare is involved, where there is neither indictment nor trial by jury.    It might as well be said that the court of quarter sessions is not a court of quarter sessions, because it keeps a separate road docket, or, for convenience, a separate docket for desertion cases, or appoints days in which it will hear a certain class of cases, or as it is said in popular parlance, will hold a 'license court.'    In the latter class of cases, where there is more than one court of common pleas within a county, it is usual for the courts themselves to designate the judges who shall hold what is known as the license court.    It has never been claimed, so far as we know— certainly not successfully claimed—that such designation was in any sense unconstitutional or that, because of the designation, a separate court was created.    It is no more so in the case under consideration than in any of the cases spoken of above."    It is a mere convenient designation of the court of quarter sessions to call it, when caring for children, a juvenile court, but no such court, as an independent tribunal, is created. It is still the court of quarter sessions before which the proceedings are conducted, and though that court, in so conducting them, is to be known as the juvenile court, the records are still those of the court of quarter sessions.

In pressing the objection that the appellant was not taken into custody by due process of law, the assumption, running through the entire argument of the appellant, is continued, that

the proceedings of the act of 1903 are of a criminal nature for the punishment of offenders for crimes committed, and that the appellant was so punished.    But he was not, and he could not have been without due process of law, for the constitutional guaranty is that no one charged with a criminal offense shall be deprived of life, liberty or property without due process of law. To save a child from becoming a criminal, or from continuing in a career of crime, to end in maturer years in public punishment and disgrace, the legislature surely may provide for the salvation of such a child, if its parents or guardian be unable or unwilling to do so, by bringing it into one of the courts of the state without any process at all, for the purpose of subjecting it to the state's guardianship and protection.    The natural parent needs no process to temporarily deprive his child of its liberty by confining it in his own home, to save it and to shield it from the consequences of persistence in a career of waywardness, nor is the state, when compelled, as parens patriæ, to take the place of the father for the same purpose, required to adopt any process as a means of placing its hands upon the child to lead it into one of its courts.    When the child gets there and the court, with the power to save it, determines on its salvation, and not its punishment, it is immaterial how it got there.    The act simply provides how children who ought to be saved may reach the court to be saved.    If experience should show that there ought to be other ways for it to get there, the legislature can, and undoubtedly will, adopt them, and they will never be regarded as undue processes for depriving a child of its liberty or property as a penalty for crime committed.

The last reason to be noticed why the act should be declared unconstitutional is that it denies the appellant a trial by jury. Here again is the fallacy, that he was tried by the court for any offense.    " The right of trial by jury shall remain inviolate," are the words of the bill of rights, and no act of the legislature can deny this right to any citizen, young or old, minor or adult, if he is to be tried for a crime against the commonwealth.    But there was no trial for any crime here, and the act is operative only when there is to be no trial.    The very purpose of the act is to prevent a trial, though, if the welfare of the public require that the minor should be tried, power to try it is not taken away

from the court of quarter sessions, for the eleventh section expressly provides that nothing in the preceding sections " shall be in derogation of the powers of the courts of quarter sessions and oyer and terminer to try, upon an indictment, any delinquent child, who, in due course, may be brought to trial." This section was entirely unnecessary, for without it a delinquent child can be tried only by a jury for a crime charged; but, as already stated, the act is not for the trial of a child charged with a crime, but is mercifully to save it from such an ordeal, with the prison or penitentiary in its wake, if the child's own good and the best interests of the state justify such salvation. Whether the child deserves to be saved by the state is no more a question for a jury than whether the father, if able to save it, ought to save it. If the latter ought to save, but is powerless to do so, the former, by the act of 1903, undertakes the duty, and the legislature, in directing how that duty is to be performed in a proper case, denies the child no right of a trial by a jury, for the simple reason that, by the act, it is not to be tried for anything. The court passes upon nothing but the propriety of an effort to save it; and if a worthy subject for an effort of salvation, that effort is made in the way directed by the act. The act is but an exercise by the state of its supreme power over the welfare of its children, a power under which it can take a child from its father, and let it go where it will, without committing it to any guardianship or any institution, if the welfare of the child, taking its age into consideration, can be thus best promoted. " The true rule is : ' That the court are to judge upon the circumstances of the particular case; and to give their directions accordingly.' " This was said in habeas corpus proceedings in Rex v. Sir Francis Blake Delaval et al., 3 Burr. 1434, by Lord MANSFIELD, in discharging Anne Catley, a minor. And he further said : " In the present case, there is no reason for the court to deliver her to her father. She has sworn ' To have received ill usage from him, before she was at all put out apprentice : ' and whilst she was with Bates, her master, it appears that her father seldom or never came near her, or ever gave her either advice or reprimand. It is even suspicious ' Whether the father and mother were not parties to the conspiracy ; ' and whether the father does not carry on this prosecution in hopes of extorting money from the defendants.

Let the girl therefore be discharged from all restraint, and be at liberty to go where she will."

By the Act of April 10, 1835, P. L. 133, which is a supplement to the act establishing the House of Refuge, authority was given to an alderman or justice of the peace, on complaint of a parent or guardian, to commit to that institution an incorrigible or vicious female under the age of eighteen years. Mary Ann Crouse was committed to the institution by Morton McMichael, a justice of the peace of the county of Philadelphia, and in remanding her to the institution in proceedings on a writ of habeas corpus for her discharge, on the ground that the act authorizing her commitment was unconstitutional, as she had not had a trial by a jury, this court, with Gibson as its chief justice, said in a per curiam: " The object of the charity is reformation, by training its inmates to industry ; by imbuing their minds with principles of morality and religion ; by furnishing them with means to earn a living; and, above all, by separating them from the corrupting influence of improper associates. To this end, may not the natural parents, when unequal to the task of education, or unworthy of it, be superseded by the parens patriæ, or common guardian of the community? It is to be remembered that the public has a paramount interest in the virtue and knowledge of its members, and that, of strict right, the business of education belongs to it. That parents are ordinarily intrusted with it, is because it can seldom be put into better hands ; but where they are incompetent or corrupt, what is there to prevent the public from withdrawing their faculties, held, as they obviously are, at its sufferance ? The right of parental control is a natural, but not an unalienable one. It is not excepted by the declaration of rights out of the subjects of ordinary legislation ; and it consequently remains subject to the ordinary legislative power, which, if wantonly or inconveniently used, would soon be constitutionally restricted, but the competency of which, as the government is constituted, cannot be doubted. As to abridgment of indefeasible rights by confinement of the person, it is no more than what is borne, to a greater or less extent, in every school; and we know of no natural right to exemption from restraints which conduce to an infant's welfare. Nor is there a doubt of the propriety of their application in the particular instance. The infant has been snatched

from a course which must have ended in confirmed depravity; and, not only is the restraint of her person lawful, but it would be an act of extreme cruelty to release her from it: " Ex parte Crouse, 4 Whart. 9. Appellate courts of other states have expressed this same view. / Among the cases which might be cited is Wisconsin Industrial School for Girls v. Clark County, 103 Wis. 651, where it is said : " The power to place children under proper guardianship has been exercised by chancellors and judges exercising chancery powers from time immemorial. Said Lord REDESDALE, in 1828, in Wellesley v. Wellesley, 2 Bligh. (N. S.), 124, the right of a chancellor to exercise such power has not been questioned for 150 years. Such a proceeding is not a trial for an offense requiring a common law, or any jury. It was never so regarded in England, nor has it been in this country in but few instances, notably cases in New Hampshire, and in People ex rel. O'Connel v. Turner, 55 Ill. 280. That case was in effect overruled by later cases and is not now considered as authority : Petition of Ferrier, 103 Ill. 367 ; McLean County v. Humphreys, 104 Ill. 378. As said, in substance, in the Ferrier case, the proceeding is not one according to the course of the common law in which the right of . trial by jury is guaranteed, but a mere statutory proceeding for the accomplishment of the protection of the helpless, which object was accomplished before the constitution without the enjoyment of a jury trial. There is no restraint upon the natural liberty of children contemplated by such a law,—none whatever; but rather the placing of them under the natural restraint, so far as practicable, that should be, but is not, exercised by parental authority. It is the mere conferring upon them that protection to which, under the circumstances, they are entitled as a matter of right. It is for their welfare and that of the community at large. The design is not punishment, nor the restraint imprisonment, any more than is the wholesome restraint which a parent exercises over his child. The severity in either case must necessarily be tempered to meet the necessities of the particular situation. There is no probability, in the proper administration of the law, of the child's liberty being unduly invaded. Every statute which is designed to give protection, care and training to children, as a needed substitute for parental authority and performance of parental duty, is but a re-

cognition of the duty of the state, as the legitimate guardian and protector of children where other guardianship fails. No constitutional right is violated, but one of the most important duties which organized society owes to its helpless members is performed just in the measure that the law is framed with wisdom and is carefully administered. The conclusions above expressed are in accordance with adjudications elsewhere with but very few exceptions : Roth v. House of Refuge, 31 Md. 329 ; Ex parte Crouse, 4 Whart. 9 ; Tiedeman Lim., sec. 50 ; Prescott v. State, 19 Ohio St. 184 ; People ex rel. Van Heck v. New York Catholic Protectory, 101 N. Y. 195 ; Cincinnati House of Refuge v. Ryan, 37 Ohio St. 197 ; St. Mary's Industrial School v. Brown, 45 Md. 310 ; Farnham v. Pierce, 141 Mass. 203."

None of the objections urged against the constitutionality of the act can prevail. The assignments of error are, therefore, all overruled and the order of the Superior Court, affirming the commitment below, is affirmed.