Commonwealth *v.* Pouls, Appellant.

Argued March 21, 1962.   Before RHODES, P. J., ER-
VIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and
FLOOD, JJ.

*Donald J. Goldberg,* with him *Garfield W. Levy,* for appellant.

*Arlen Specter,* Assistant District Attorney, with him *Louis F. McCabe,* Assistant District Attorney, *Paul M. Chalfin,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY WOODSIDE, J., June 15, 1962:

Barry Pouls appeals to this Court from the sentences imposed in the Court of Quarter Sessions of Philadelphia on the charges of rape, solicitation to commit sodomy and indecent assault.[1]

On a Sunday night in August 1960, Geraldine Galazyk and her friend, Kathleen McGuire, went to a public dance. There they danced and had a soda with "Bob" and "Vic", whose names they later learned to be Barry Pouls and Sheldon Friedman. They had never seen the boys before and were not introduced. The boys asked the girls to go with them in Sheldon's car to get something to eat. The girls accepted the invita-

---

[1] All of the cases, including the rape and sodomy charge, were given Quarter Sessions Court numbers.

tion, and the four of them left the dance after eleven o'clock and went to a restaurant where they ate.

When they left the restaurant, Barry and Geraldine entered the back seat of Sheldon's four door sedan. Kathleen sat in the front seat with Sheldon who drove. Instead of taking the girls directly home, Sheldon drove into a building development and parked in a dark area. Barry made advances to Geraldine. At Sheldon's suggestion, Kathleen and he left the car and stood directly in front of it. A few minutes later Barry and Geraldine left the car and went into a partially constructed house. The floor was not completed in front of the door, and Barry fell into the cellar. Geraldine waited for him to crawl out of the cellar, and then the two went into the house and had intercourse on the floor. They returned to the car, and the boys took the girls to Geraldine's home. When they arrived at Geraldine's home, Barry shook hands with her and said, "We are still friends." The girls made no effort to get the license number of the car, although at that time they knew Sheldon Friedman only as "Vic" and Barry Pouls only as "Bob".

When Geraldine arrived home, her mother was waiting for her. It was then 2 o'clock, and Geraldine had never before been out after 11:30 o'clock. Her mother immediately questioned her, and after she said she thought she was bleeding, undressed her and examined her. Geraldine's father and mother then took her to a hospital. The physician who examined her was not called, so we do not know what he found. From the hospital, Geraldine's parents took her to the police station where a charge of rape was filed, and a description of the boys was given to the detectives. The boys were apprehended by the police two weeks later at the same dance hall where they picked up Geraldine and Kathleen. Barry promptly admitted that he was with Geraldine during the night in question and that he had intercourse with her, but he denied using any force or threats. He also denied the sodomy charges.

These facts are all undisputed. But there is more to Geraldine's story, and we must view the disputed facts in the light of the jury's verdict. We thus accept as true the following testimony of Geraldine concerning what happened after they parked at the housing development: "I went to get out of the car with Cass, and I reached for my pocketbook, and I had my hand on the door. Cass assumed I was getting out with her, but when I went to open the door Harry Pouls leaned over and said that I was not going anywhere, and he locked the door.

"He said he wanted to kiss me and also said what he wanted to do—all he said is that he wanted to play. I asked Sheldon Friedman if he would help me, and he said, 'No.' I tried to talk to Bob and try to tell him what kind of girl I was, but he would not listen. Then he started to pull me down on the seat, and when I reached for the handle of the door to try to pull myself back up again, I managed to pull myself up but he pulled me back down again on the seat. I was fighting and trying to get him off of me. I screamed for Cass to help me. Then Bob had pulled up my dress.

"I screamed again for Cass, but I did not hear any noise outside or anything, and I screamed again, and I was still trying to fight Bob when he said to me, 'If you don't stop and take your hands away, I am going to kill you.' When he said that, it was like everything in me stopped moving. I said a prayer because I thought I was going to die. Bob said all he wanted to do was suck it . . . After that he put his private part of his body into my body. After that he stopped and got up, and he said to me that he wanted to do it five minutes more and then he would take me home, and he said if not it would be a long drawn-out night.

"He opened the car door and took me by the hand, and we went to one of those unfinished houses, and when we walked in he fell through something. Then he

got up and told me to lay on the floor, . . . and he pulled up my dress again and got on top of me again and he put the private part of his body into the private part of my body, and it was about five minutes and then he stopped and he said he didn't want to do it any more, because he knew that I didn't want it, and then he got up and took me back to the car."[2]

At the time of this offense, Barry was 17 years old, and Geraldine was 19 years old. When Barry was apprehended a petition was filed and a hearing held in the Juvenile Division of the County Court of Philadelphia. At the close of the testimony, the judge directed that Sheldon Friedman be brought before him. When it then developed that Sheldon was 19 years old, and thus beyond the age over which the Juvenile Court had jurisdiction, the judge suggested that charges of conspiracy be brought against Sheldon, and said, "That would indicate the matter can best be determined by a certification from this Court to the Quarter Sessions Court." The case was then certified to the Court of Quarter Sessions where, in the vernacular of the courtroom, Barry had the book thrown at him. He was charged with rape, assault with intent to ravish, sodomy, solicitation to commit sodomy, threats to do bodily harm, assault and battery, aggravated assault and battery, indecent assault and conspiracy. Upon conviction of rape and solicitation to commit sodomy, the trial judge told the defendant he intended to impose a sentence of life imprisonment upon him under the Barr-Walker Act of January 8, 1952, P. L. (1951) 1851, 19 P.S. §1166. After receiving a pre-sentence investigation report, the court sentenced the defendant to a total of 7½ to 20 years in the Eastern Penitentiary, 7½ to 15 years on the rape conviction, and 5 years probation on the solicitation conviction, to commence at

---

[2] The last part of this paragraph is from the testimony of Geraldine during a hearing in Juvenile Court.

the expiration of the sentence for rape. Sheldon was charged with conspiracy, and was acquitted. Barry had several character witnesses who testified on his behalf at the trial. He had no criminal record, and the juvenile court records show that he had not previously been in that court.

The defendant appealed to this Court alleging specific trial errors. We have examined all these contentions, and we have concluded that they are without merit.

We are also urged to set aside the sentence as grossly excessive. The Board of Pardons has authority to commute excessive sentences, and this Court does not propose to encroach upon the constitutional authority of that board. See *Commonwealth v. Smith,* 405 Pa. 456, 176 A. 2d 619 (1962). Our appellate courts have said many times that the discretion of the trial court is not to be interfered with in the imposition of a sentence within the statutory limits. *Commonwealth v. Fitzgerald,* 101 Pa. Superior Ct. 308 (1931). In reiterating this rule, we recognize that the appellate courts are not without authority to modify a sentence which is "manifestly excessive and inflicts too severe a punishment." *Commonwealth v. Bilinski,* 190 Pa. Superior Ct. 401, 407, 154 A. 2d 322 (1959); *Commonwealth v. Garramone,* 307 Pa. 507, 161 A. 733 (1932); *Commonwealth v. Irelan,* 341 Pa. 43, 17 A. 2d 897 (1941); *Commonwealth v. Green,* 396 Pa. 137, 151 A. 2d 241 (1959); *Commonwealth v. Downer,* 161 Pa. Superior Ct. 339, 53 A. 2d 897 (1947); Act of June 24, 1895, P. L. 212, §8, par. 8, 17 P.S. §192.

*This case involves more than the imposition of an excessive sentence.* Here a juvenile is facing a 20 year sentence with a 7½ year minimum for an offense that would ordinarily have been disposed of in the Juvenile Court. This sentence must be examined in the light of the expressed policy of this Commonwealth concerning

the disposition of cases brought against delinquent juveniles.

In enacting The Juvenile Court Law of June 2, 1933, P. L. 1433, 11 P.S. §243 et seq., the legislature expressed its belief that "the real interests of [delinquent] children require that they be not incarcerated in jails and penitentiaries, as members of the criminal class, but be subjected to wise care, guidance and control so that evil tendencies may be checked and better instincts be strengthened." See Preamble of Act of 1933, supra.

As early as 1881, the Pennsylvania Legislature had provided a separate institution for boys "between the ages of fifteen and twenty-five and not known to have been previously sentenced to a penitentiary or state prison." Act of June 8, 1881, P. L. 63, §8; 61 P.S. §482.

The courts of quarter sessions and oyer and terminer are directed, by §14 of The Juvenile Court Law, supra, 11 P.S. §256, to transfer to the juvenile court any case against a juvenile committed when he was under 16 years of age, and are given the discretion of retaining or transferring cases against a juvenile committed when he is 16 years of age or over and under 18 years of age.

We recognize that the juvenile courts are not vested with sole and exclusive jurisdiction over delinquent juveniles. The Juvenile Court Law, in addition to the above provision, exempts from the jurisdiction of the juvenile court any charge of murder. Furthermore, in declaring constitutional the Juvenile Court Act of April 23, 1903, P. L. 274, the Supreme Court said that "If the welfare of the public require that a minor should be tried, power to try it is not taken away from the court of quarter sessions . . ." *Commonwealth v. Fisher*, 213 Pa. 48, 53, 54, 62 A. 198 (1905). The courts of quarter session and oyer and terminer have the power to try juveniles over 14 years of age, if the welfare

of the public requires it. If a juvenile has been declared delinquent and the processes of the juvenile court have been tried without beneficial results, or if the offense with which a juvenile is charged is of unusual magnitude, or if there are some peculiar circumstances which suggest inadequacies in the processes of the juvenile court, the welfare of the public may require disposition of the case in the courts of quarter sessions or oyer and terminer. *Commonwealth v. Krynicky,* 158 Pa. Superior Ct. 633, 46 A. 2d 37 (1946); *Trignani's Case,* 150 Pa. Superior Ct. 491, 493, 28 A. 2d 702 (1942); The Juvenile Court Law of 1933, supra, §18, 11 P.S. §260.

It appears that this case was transferred to the criminal courts for trial primarily because the Juvenile Court thought that Sheldon, whose violation could not be heard in that court, should be tried with Barry. The defendant was a juvenile when the offense was committed. There was evidence that he had a good reputation. He had never been in either juvenile court or criminal court prior to this offense. Without minimizing the serious nature of the appellant's offense, we cannot overlook the fact that the criminal dockets are filled with records of rapes committed by more mature men, with criminal records, who, with more determined resistance by the victim, used much greater force. The defendant's conduct was reprehensible, but he can hardly be classified as one of the most vicious rapists known to the law.

This case could have been disposed of in Juvenile Court, and probably should have been. However, the courts below have broad discretion in transferring cases between the juvenile courts and the criminal courts. Except for gross abuse of that discretion, we shall not set aside a transfer which appears to have been warranted at the time the court ordered it.

But, when there is a serious doubt as to which court should take jurisdiction, we cannot permit a juvenile to suffer a sentence so severe that it completely ignores both the circumstances of the offense and the policy of the Commonwealth relating to juvenile offenders. To impose upon this juvenile first offender the maximum penitentiary sentence permitted for rape (except the life sentence authorized under the Barr-Walker Act, supra) is so manifestly excessive that it must be set aside. The *maximum* sentence which can justly be imposed upon this juvenile is a sentence to the State Correctional Institution at Camp Hill, formerly the Pennsylvania Industrial School.

The judgment of sentences is set aside and the case remanded for resentencing not inconsistent with this opinion.

WRIGHT, J., would grant a new trial.

---

CONCURRING OPINION BY MONTGOMERY, J.:

I find myself with serious conflicting feelings in this case. On the one hand, I fail to see any merit to appellant's plea for a new trial. The reference to the Elmo Smith case does not justify one, and the evidence is sufficient to sustain the convictions. On the other hand, I am sympathetic to his appeal for help from the effect of his sentence, which is grossly excessive in the light of the facts of the case, the age of the appellant, and his prior record of conduct.

Although I am always reluctant to interfere with the exercise of discretion by a trial judge, particularly in the matter of sentencing one convicted of crime, I am constrained to do so in this case.

Therefore, on the authority of *Commonwealth v. Green*, 396 Pa. 137, 151 A. 2d 241, and *Commonwealth v. Bilinski*, 190 Pa. Superior Ct. 401, 154 A. 2d 322, I

would remand this case to the lower court for resentencing.

---

DISSENTING OPINION BY ERVIN, J.:

Barry Pouls appeals from judgments of sentence after a verdict of guilty by a jury on the charges of rape, solicitation to commit sodomy and indecent assault.

Geraldine Galazyk, a 19-year old girl, the prosecutrix, testified that she and a girl friend by the name of Kathleen McGuire went to a dance in the City of Philadelphia; that during the evening they danced several times with the defendant and his friend, Sheldon Friedman; that the two boys invited the girls to go out and have something to eat; that the girls accompanied the boys in a car driven by Friedman; that after having something to eat they got in the car and the girls believed they were being driven toward their homes; instead the car was driven to an uncompleted building project, where it was stopped; that Friedman directed Miss McGuire to get out of the car; the prosecutrix asked Miss McGuire not to leave her and Friedman took her by the hand and led her out of the car; that prosecutrix sought to leave the car but was stopped by the appellant; that appellant began indecent advances toward prosecutrix, who resisted and screamed; whereupon defendant threatened her and finally accomplished both sodomy and rape; that defendant thereafter led prosecutrix to one of the unfinished dwellings where once more he compelled prosecutrix to submit to intercourse; that the girls were driven to the home of the prosecutrix at about 1:30 a.m.; that the prosecutrix immediately told her mother of the occurrence. The police were informed and the prosecutrix was taken to a hospital at once and she was examined in the hospital by a Dr. Marcello. The appellant admitted the

intercourse but said it was with Geraldine's consent. The only real issue in the case was whether the admitted intercourse was with Geraldine's consent or was against her will. This was a question for the jury and they believed the girl.

In his motion for a new trial the defendant in the court below argued only the refusal of the trial judge to withdraw a juror when the prosecutrix likened herself to "Mary Mitchell," victim in the notorious Elmo Smith murder case. During the cross-examination of the prosecutrix it was developed that when she and defendant entered the unfinished house defendant fell through the floor. The cross-examination then proceeded as follows: "Q. How long did it take him to climb out? A. A few seconds. Q. It might have been as long as a few minutes? A. Yes. Q. What were you doing in this time? A. I stood there. Q. You stood there and watched him climb out? A. Yes. Q. Why didn't you run away? A. Because I was so terrified and I was afraid I would wind up like Mary Mitchell if I ran. Q. Weren't you afraid of your life in remaining as you testified before? A. Yes, I was." Following this reference counsel for the defendant moved for the withdrawal of a juror. The motion was denied, at which time the court said: "The motion is denied because I not only heard nothing prejudicial but I was watching the reaction of the jury during the entire cross-examination of the witness, and when she testified in that respect, and I noticed no sign of any recognition given by any of the jurors to that particular portion of the testimony. I am sure no prejudice will result. Your motion is denied, and you have an exception." This was not an emotional outburst by the victim. It was a responsive reply to a question propounded by counsel for the defendant. What counsel for the defendant really wanted to know was the state of the prosecutrix's mind. The reply was entirely proper and gave him the infor-

mation which he sought. He should not be permitted to complain. *Com. v. Duca,* 312 Pa. 101, 165 A. 825.

What was said in *Com. v. Jerko,* 98 Pa. Superior Ct. 34, 39, is apropos: "The disposition of the question, whether a juror should be withdrawn for causes of the character under consideration is largely one for the discretion of the trial judge and the appellate courts will reverse only in cases of manifest error: Com. v. Striepeke, 32 Pa. Superior Ct. 82."

After a consideration of the entire record I am of the opinion that the jurors were not unduly influenced against the defendant on account of the reply given by the prosecutrix. It is worthy of note that the witness did not even recall the correct name of the victim in the Elmo Smith case. In that case the name has never been written as "Mary" but always "Maryann" or "Mary Ann."

Counsel for appellant has raised two other points, which need not be considered because they were not raised in the court below: *Com. v. DiCarlo,* 174 Pa. Superior Ct. 611, 101 A. 2d 410. I have, however, given consideration to both of these points and am convinced that neither one warrants the reversal of the court below. While the sentence of the court was severe, I do not believe that we should interfere with the discretion exercised by the trial judge. *Townsend v. Burke,* 334 U. S. 736, 741, 68 S. Ct. 1252, 92 L. Ed. 1690, 1693; *Com. ex rel. Dempsey v. Martin,* 181 Pa. Superior Ct. 274, 124 A. 2d 430.

I would affirm the judgments of sentence.

RHODES, P. J., joins in this dissenting opinion.