Commonwealth *v.* Greiner, Appellant.

Argued March 19, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Daniel H. Shertzer*, for appellant.

*Michael H. Ranck*, Assistant District Attorney, with him *Mary Anne Motter*, Assistant District Attorney, and *D. Richard Eckman*, District Attorney, for Commonwealth, appellee.

OPINION BY PRICE, J., September 22, 1975:

On June 21, 1974, appellant, David Wayne Greiner, was tried before a jury and convicted of criminal conspiracy,[1] burglary,[2] attempted kidnapping,[3] aggravated assault,[4] and attempted murder.[5] His motions for new trial and in arrest of judgment were subsequently refused, and it is from the denial that appellant has appealed.

The testimony adduced at trial revealed that in the early morning of July 26, 1973, the Lancaster County

---

1. Act of Dec. 6, 1972, P.L. 1482, No. 334, §1 (18 Pa.C.S. §903).

2. Act of Dec. 6, 1972, P.L. 1482, No. 334, §1 (18 Pa.C.S. §3502).

3. Act of Dec. 6, 1972, P.L. 1482, No. 334, §1 (18 Pa.C.S. §2901).

4. Act of Dec. 6, 1972, P.L. 1482, No. 334, §1 (18 Pa.C.S. §2702).

5. Act of Dec. 6, 1972, P.L. 1482, No. 334, §1 (18 Pa.C.S. §2502).

Police Department received a report of a stabbing on New Garden Avenue in Lancaster. Officer Armentrout was sent to investigate. When he arrived at the scene, he saw the victim, Robert Groff, lying in the doorway of 60 New Garden Avenue. Mr. Groff was bleeding from numerous stab wounds, later learned to number fifteen, many of which were at or near vital parts of his body. Around the victim's arm was one shackle of a set of handcuffs, and a rope was on the ground near his neck.

An ambulance was summoned. While the rescue team administered aid to Mr. Groff, he told Officer Armentrout that "[t]hree boys came into my house. They stabbed me. I don't know why. They were looking for Sandy [the victim's nineteen-year-old son]." (NT 12)

At approximately 1:30 a.m., that morning, Detective Simms was assigned to the case. While the detective waited for his partner to arrive, three boys walked into the lobby of the police station. One of the boys, Edward William Trees,[6] told Simms that, "[w]e want to turn ourselves in. . . . I cut that man." Simms warned the boys to remain silent until they had been apprised of their constitutional rights. He then ascertained that appellant was a juvenile, and called Youth Officer Arno Schoch to handle his case.

Schoch informed appellant of his *Miranda* rights and assured himself that appellant (who was fifteen years of age and an honor student in high school) understood their meaning. Appellant then made a lengthy statement which disclosed his involvement in the stabbing of Mr. Groff. The substance of his statement was that early in July, he had been approached by his brother and Edward Trees, who wanted to kidnap Sandy Groff, the victim's son. After

---

6. The youths were later identified as appellant, appellant's brother and Edward William Trees. Appellant's brother was separately tried and convicted of charges based on his participation in this crime. Trees has been committed to an institution for the criminally insane.

discussing several methods of accomplishing their goal, the boys decided to go directly to the Groff home at the end of July. Upon their arrival, they located an open door which they entered. Appellant found a door which he thought would lead to Sandy's bedroom, entered the room and shook the person in the bed. When the man sat up, appellant realized that he was Sandy's father.

Appellant's statement further indicated that after a time, Edward Trees entered the room carrying a gun.[7] He told Mr. Groff to lay on his stomach. When the victim complied, appellant removed handcuffs from his pocket, put them on Mr. Groff's wrists, and led him through the kitchen and to the driveway. A discussion took place about the amount of money it would take for the boys to release Mr. Groff. The victim stated that he had $5,000 at his place of business, but the key to the building was in the house. At this time, appellant placed medical tape over the victim's mouth "to keep him quiet." He was then led back to the house by a rope which had been tied around his neck, and which appellant was holding. Before he could enter, however, Edward Trees struck Mr. Groff's head with a lug wrench three or four times and stabbed him in the stomach area several times.[8] Groff fell down, and the boys fled. After stopping at Trees' home for money, the boys drove to the Harrisburg Pike, entered Route 30 and went east. They drove around the by-pass for about 10 minutes, then decided to turn themselves in to the Lancaster Police Department, where the statement was made.

Appellant then accompanied Detective Schoch and Police Cadet Wilson on a search for the weapons used in the crime. They found the knife sheath which appellant

---

7. Trial testimony indicated that appellant held a knife throughout this series of events.

8. The victim testified that he thought appellant had stabbed him.

had held and the gloves which he had thrown from the car after the crime, but could not locate the pellet gun which Trees had held. The knife was located at a later time.

Appellant was subsequently committed to Barnes Hall. On August 6, 1973, the District Attorney petitioned the Juvenile Court to transfer the case to the Criminal Division, pursuant to §50-325 of the Juvenile Act,[9] for prosecution of the offenses charged. Following a hearing on the petition, the lower court transferred appellant to the Criminal Division, where he was later tried and convicted by a jury. By objections made throughout the proceedings, appellant has contended that the transfer was improper. He now seeks to have the transfer set aside and the case remanded to the Juvenile Court.

The standards which guide a judge in making his determination to transfer a juvenile to the criminal court for trial are set forth in the Juvenile Act at §50-325, *supra*. That section provides in relevant part:

"(a) After a petition has been filed alleging delinquency based on conduct which is designated a crime or public offense under the laws, including local ordinances, of this State, the court before hearing the petition on its merits may rule that this act is not applicable and that the offense should be prosecuted, and transfer the offense, where appropriate, to the trial or criminal division or to a judge of the court assigned to conduct criminal proceedings, for prosecution of the offense if:

(1) The child was fourteen or more years of age at the time of the alleged conduct; and

(2) A hearing on whether the transfer should be made is held in conformity with this act; and

(3) Notice in writing of the time, place, and purpose of the hearing is given to the child and his

---

9. Act of Dec. 6, 1972, P.L. 1464, No. 333, §28 (11 P.S. §50-325).

parents, guardian, or other custodian at least three days before the hearing; and

(4) The court finds that there is a prima facie case that the child committed the delinquent act alleged, and the court finds that there are reasonable grounds to believe that: (i) the child is not amenable to treatment, supervision or rehabilitation as a juvenile through available facilities, in determining this the court may consider age, mental capacity, maturity, previous record and probation or institutional reports; and (ii) the child is not committable to an institution for the mentally retarded or mentally ill, and (iii) the interests of the community require that the child be placed under legal restraint or discipline or that the offense is one which would carry a sentence of more than three years if committed as an adult. . . ."

It is noteworthy that §50-325 was adopted several years after *Kent v. United States,* 383 U.S. 541 (1966), the leading case espousing juvenile rights. *Kent* involved a transfer proceeding which the United States Supreme Court held to be violative of the child's rights to due process of law. The Court found that a hearing must be held before a transfer is permitted, at which the child is afforded counsel. Following the hearing, the judge must detail the reasons for his decisions. The Court stated: "[W]e hold that it is incumbent upon the Juvenile Court to accompany its waiver order with a statement of the reasons or considerations therefor. We do not read the statute as requiring that this statement must be formal or that it should necessarily include conventional findings of fact. But the statement should be sufficient to demonstrate that the statutory requirement of 'full investigation' has been met; and that the question has received the careful consideration of the Juvenile Court; and it must set forth the basis for the order with sufficient specificity to permit meaningful review." 383 U.S. at 561.

In the instant case, the requirement of *Kent, supra,* and of the Juvenile Act have been met. The lower court

conducted a full hearing, at which the Commonwealth introduced testimony regarding the nature of the alleged crimes. The Commonwealth also called a probation officer who had investigated appellant's background. The witness stated that in his opinion, appellant was "in need of some firm form of rehabilitation." (NT Transfer Hearing, 35). However, he also indicated his belief that the boy could be better rehabilitated through the juvenile system than in an incarcerated population composed only of adults. He further testified that a correctional facility such as Camp Hill, which currently houses both juvenile and adult offenders, would provide adequate guidance and rehabilitation for appellant. Of course, the weight to be accorded this testimony was for the court below to assess. *Commonwealth v. Porter*, 229 Pa. Superior Ct. 314, 323 A.2d 128 (1974).

Following the hearing, the lower court issued an order granting the transfer and setting forth its findings. The judge found that appellant was fifteen years of age at the time of the alleged offenses, that the notice required by statute had been given, that appellant was represented by counsel at the hearing, that the Commonwealth had established a prima facie case against appellant, and that appellant was not amenable to treatment as a mentally retarded or mentally ill person. The judge further found that appellant could be sentenced to a term of imprisonment of more than three years if convicted in criminal court; that the interests of the community would be best served by placing appellant under legal restraint or discipline; and that appellant was not amenable to the treatment, supervision or rehabilitation available through the juvenile court, except that provided at Camp Hill.[10] In reaching this decision, the lower court

---

10. Following his conviction after trial in the Criminal Division, appellant was incarcerated at Camp Hill. As noted by the supreme court in *Commonwealth v. Pyle*, 462 Pa. 613, 624, 342 A.2d 101, 107 n. 16 (1975), adjudicated delinquents and convicted criminals receive the same treatment at Camp Hill.

also considered the brutality of the stabbing and striking of the victim and the serious nature of the charges against appellant and his co-conspirators.

The recent case of *Commonwealth v. Pyle,* 462 Pa. 613, 342 A.2d 101 (1975), supports our conclusion that the lower court properly certified appellant to criminal court.

It is axiomatic that before this court will set aside a transfer, the appellant must show a gross abuse of the broad discretion afforded the hearing judge. *Commonwealth v. Pouls,* 198 Pa. Superior Ct. 595, 182 A.2d 261 (1962). Such abuse is not merely an error of judgment, but the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment based upon partiality, prejudice or ill will. *In re Garrett's Estate,* 335 Pa. 287, 6 A.2d 858 (1939).

In view of the lengthy pre-transfer hearing and the lower court's attention to the suggestions presented by §50-325 of the Juvenile Act, we believe the transfer was properly ordered. We can find no abuse of discretion.

Appellant next contends that he was tried and convicted of charges which had not been transferred to the Criminal Division. This contention is clearly without merit, for the transfer order stated:

> "Based on the foregoing findings, the Court transfers David Wayne Greiner to the Criminal Division of the Court of Common Pleas of Lancaster County *for prosecution of the offenses alleged to have been committed by him.*" (emphasis added)

All of the charges against appellant were included in the petition which requested his transfer, and all were transferred by the court's order.

Finally, appellant asserts that his preliminary hearing was held in violation of the Pennsylvania Rules of Criminal Procedure. The docket entry of August 22, 1973, states that defense counsel "waived the 3 day requirement [of Pa. R. Crim. P. 140 (f) (1)] and reading of the complaints." Having waived the requirements of

the Rule, appellant cannot now contest the validity of the procedure employed.

Judgment affirmed.

DISSENTING OPINION BY HOFFMAN, J.:

Appellant, a juvenile convicted of attempted murder and related charges, contends that his transfer from juvenile court to the criminal division of the court of common pleas was improper because the Juvenile Court failed to make the requisite finding that the juvenile was not amenable to treatment in an available juvenile facility.[1]

In the early morning hours of July 26, 1973, police received a report of a stabbing on New Garden Avenue in the Township of Lancaster, Lancaster County. When Officer Armentrout of the Lancaster Police Department arrived at the scene, he observed the victim, Mr. Robert Groff, lying in the doorway of 60 New Garden Avenue. Groff was soaked in blood from numerous stab wounds; one shackle of a set of handcuffs was attached to his arm and a length of rope was lying near his neck. While an ambulance rescue team was working on Groff, he told the officer that "[t]hree boys came into my house. They stabbed me. I don't know why. They were looking for Sandy [the victim's nineteen-year-old son]."

At approximately 1:30 a.m., Detective Simms, also of the Lancaster Police Department, was on duty to investigate the Groff stabbing. While Simms waited for his partner to arrive, three youths walked into the lobby of the police station. One of the youths, later identified as Edward Trees,[2] told Simms that "We want to turn

1. Appellant alleges several other grounds mandating reversal of his conviction. I do not reach these contentions because I believe that he was improperly transferred to the criminal division.

2. Appellant's brother was tried separately and convicted of the same charges; Trees has been committed to an institution for the criminally insane.

ourselves in . . . I cut that man." The detective warned them to remain silent until they had been apprised of their constitutional rights. Because appellant was a juvenile, the detective called in Youth Officer Arno Schoch.

After Schoch read the appellant his "Miranda" warnings and assured himself that the juvenile understood those rights, the officer recorded the following formal statement: "Sometime back around the fourth of July, my brother William Alfred Greiner and Edward William Trees approached me and spoke to me about kidnapping Sandy Groff of 65 Garden Avenue. We originally planned on pretending that we had car trouble, and planned [on] flagging Sandy down as he drove by, but on Wednesday night we changed our minds and decided to enter the home at 65 New Garden Avenue. This was the home of Sandy's father.

". . . [On] Thursday morning, . . . we arrived at the Groff home at approximately 0102 hours. We went around to the side of the home where we found a door open. This door led to the kitchen. My brother . . . stayed outside as a lookout, and myself and Edward Trees went inside through the kitchen, dining room and a small hallway that led to the bedrooms. I opened the door to which I thought was Sandy's bedroom. I went over and awakened the person who was in the bed. When this person sat up, I realized that it was not Sandy and that it was his father.

". . . [Trees] told Mr. Groff to lay on his back and then on his stomach. He did this. And at this time I reached into my backpocket and got out Edward's handcuffs and put them on Mr. Groff's wrists. At this time we instructed Mr. Groff to get up, and we took him back to the kitchen.

"When we got to the kitchen we went outside on to a porch and we sat him down and I placed some medical tape around his mouth to keep him quiet. We then walked him down to the driveway. At this time Mr. Groff stated to us that he would give us five thousand dollars if he

could get a key to open up his business downtown on Orange Street. We then returned to the kitchen door. Mr. Groff turned around and opened the door with his hands behind his back. I was holding a rope around Mr. Groff's neck. . . .

"At this time Edward Trees struck Mr. Groff on the head with a lug wrench. Mr. Groff fell to the floor inside the doorway. Edward Trees then struck Mr. Groff in the head two additional times. Mr. Groff then got up. Edward Trees then stabbed Mr. Groff in the midsection approximately three to four times. Mr. Groff fell to the floor again.

"At this time the three of us ran to Edward's car, started the car up and proceeded east on Wilson Avenue to Wilson Drive. . . . At this time I threw the case that was for the knife that Edward stabbed Mr. Groff with out the window of the car, and also a pair of gloves. . . .

"At this time we went to Edward Trees' home . . . Edward went inside to get some money and my brother and I remained in the car. . . . We left his home and headed for the Harrisburg Pike. We went out the Harrisburg Pike and get on the Route 30 by-pass and headed east. We drove around the by-pass for about ten minutes, and then decided to turn ourselves in to the police, and at this time we came to the Lancaster City Police Department and gave up."

Subsequent to appellant's signing the statement, appellant accompained Schoch and Police Cadet Wilson on a search for the weapons used in the crime. They found the knife sheath and the gloves that appellant had thrown from the automobile, but were unable to locate the knife or the pellet gun. Thereafter, appellant was committed to Barnes Hall.

On August 6, 1973, the District Attorney of Lancaster County petitioned the Juvenile Court to transfer the juvenile to the Criminal Division of the Court of Common Pleas of Lancaster County for prosecution of the

offenses charged, pursuant to §50-325 of the Juvenile Act.[3] A hearing was held on August 21, 1973; President Judge JOHNSTONE granted the petition and transferred the appellant to the criminal division. In July, 1974, appellant went to trial before a jury on charges of conspiracy, burglary, attempted kidnapping, attempted murder, and aggravated assault. The jury found appellant guilty of all charges.

The appellant has contended throughout the proceedings against him that he was improperly transferred to the criminal division of the court of common pleas. The issue that we must decide is whether the Juvenile Court's decision to transfer the appellant comported with the requirements of *Kent v. United States*, 383 U.S. 541 (1966), and with the dictates of §50-325 of the Juvenile Act, supra.

At the hearing before the Juvenile Court, the victim and Officer Schoch testified concerning the details of the crime. In addition, a probation officer who conducted an investigation of appellant's background stated that appellant came from a good family, that he performed well academically (he was in the top fifth of his ninth grade class at Lancaster Catholic High School), that he had never been in disciplinary difficulty and that he had no prior juvenile record. The probation officer recommended retention of jurisdiction within the juvenile system because he believed that appellant could be rehabilitated within a sufficiently structured juvenile facility; he felt that rehabilitation would not be possible in an adult institution. The court refused to hear the report of a clinical psychologist because the psychologist was not present, despite agreement by the Commonwealth and the appellant that the report be read into the record.

The Juvenile Court's opinion accompanying appellant's transfer stated:

---

3. Act of 1972, Dec. 6, P.L. 1464, No. 333, §1, eff. in 60 days; 11 P.S. §50-101 et seq.

"... the Court finds that David Wayne Greiner was 15 years of age at the time of the alleged offenses; that the required notice of the time, place and purpose of the hearing was given to David Wayne Greiner and his parents; that the said minor was represented by counsel of his or his parents' own choosing at the hearing; that there was a prima facie case presented of conspiracy on the part of this juvenile to commit kidnapping, of entering a private dwelling for the purpose of committing a crime, of kidnapping and of aggravated assault and battery by stabbing with a knife and striking the victim on the head with a tire iron, causing extremely serious injuries; that David Wayne Greiner is not amenable to treatment, supervision or rehabilitation through available facilities for juveniles, except the State Correctional Institution at Camp Hill which confines a mixture of adults and juveniles; that the juvenile is not committable to an institution for mentally retarded or mentally ill; that the interests of the Community require that the juvenile be placed under legal restraint or discipline; and that the offenses charged would carry a sentence of more than three years if committed by an adult. Based on the foregoing findings, the Court transfers David Wayne Greiner to the Criminal Division of the Court of Common Pleas of Lancaster County for prosecution of the offenses alleged to have been committed by him."

I

The United States Supreme Court delineated the rights of a juvenile faced with the possibility of a transfer to criminal court in *Kent v. United States,* supra.

In *Kent,* the petitioner was picked up in connection with a recent housebreaking and rape. After extensive questioning, Kent confessed to the specific crimes and several other similar episodes. The relevant statute governing transfer of a juvenile in effect at the time provided:

"If a child sixteen years of age or older is charged with an offense which would amount to a felony in the case of an adult, or any child charged with an offense which if committed by an adult is punishable by death or life imprisonment, the judge may, after full investigation, waive jurisdiction and order such child held for trial under the regular procedure of the court which would have jurisdiction of such offense if committed by an adult . . ."[4]

Despite several motions by petitioner's counsel, the Juvenile Court neither held a hearing nor stated reasons for his decision to transfer jurisdiction to the criminal division of the United States District Court. The Supreme Court vacated the petitioner's conviction and remanded for a rehearing:[5] ". . . petitioner was entitled to a hearing . . . and *to a statement of reasons for the Juvenile Court's decision.* We believe that this result is required by the statute read in the context of constitutional principles relating to due process and the assistance of counsel."[6] 383 U.S. at 557. (Emphasis added).

---

4. D.C. Code §11-914 (1961).

5. The Court in *Kent* was faced with a problem that is not present in the instant case. By the time the Court announced its decision in *Kent*, the petitioner was a "geriatric" juvenile, no longer young enough to be treated within the juvenile system. Therefore, the Court remanded for a hearing de novo on waiver and stated that "If [the District Court] finds that waiver was inappropriate, petitioner's conviction must be vacated. If, however, it finds that the waiver order was proper when originally made, the District Court may proceed . . . to enter an appropriate judgment." 383 U.S. at 565. Appellant, fifteen at the time of the crime, is, at the time of this opinion, still within the jurisdiction of the Juvenile Court.

6. A number of courts have held that *Kent* merely interpreted the District of Columbia statute and that the result was not constitutionally mandated. See, e.g., *Stanley v. Peyton,* 292 F. Supp. 209 (1968); *Mullin v. State,* Wyoming, 505 P.2d 305 (1973); *Lujan v. District Court,* 161 Mont. 287, 505 P.2d 896

The Court did not express a view on the merits of the transfer in *Kent*, despite data on the record concerning Kent's extensive criminal involvement. It did state, however, that a statement of reasons was necessary to guarantee a meaningful review of the Juvenile Court's decision: "[A reviewing court] must have before it a statement of the reasons motivating the waiver including, of course, a statement of the relevant facts. It may not 'assume' that there are adequate reasons, . . . Accordingly, we hold that it is incumbent upon the Juvenile Court to accompany its waiver order with a statement of the reasons or considerations therefor. . . . [T]he statement should be sufficient to demonstrate that the statutory requirement of 'full investigation', has been met; and that *the question has received the careful consideration of the Juvenile Court; and it must set forth the basis for the order with sufficient specificity to permit meaningful review.*" 383 U.S. at 561 (Emphasis added).

## II

In an Appendix to *Kent*, the Court cited a policy memorandum for the Juvenile Court judges of the District of Columbia that pointed out that the statute contained no standards to decide when to transfer a juvenile. Therein, the Juvenile Court adopted eight criteria to be

---

(1973); *Hazell v. State*, 12 Md. App. 144, 277 A.2d 639 (1971); *State v. Johnson*, 5 N.C. App. 469, 168 S.E. 2d 711 (1969). *Contra*, see, *United States ex rel. Turner v. Rundle*, 438 F.2d 839, 842, n.11 (3d Cir. 1971), which cites exhaustive authority holding *Kent* requirements constitutionally mandated. See also Schornhorst, The Waiver of Juvenile Court Jurisdiction: Kent Revisited, 43 Ind. L. J. 583, 602 (1968): "After a careful reading of *Kent* and *Gault* [*In Re Gault*, 387 U.S. 1], a question as to the constitutional status of the holdings in the former case would seem pure rhetoric." The issue seems to have been decided in favor of a constitutional reading of *Kent* in Pennsylvania. *Freeman Appeal*, 212 Pa. Superior Ct. 422, 242 A.2d 903 (1968).

used in evaluating the merits of transferring a juvenile to the criminal division of the court.[7]

Although the specific criteria cited by the Supreme Court were not part of the *Kent* decision,[8] our legislature adopted similar standards when it enacted the Juvenile Act, supra, 11 P.S. §50-325 (a) :

"[The Juvenile] Court . . . may rule that this act is not applicable and that the offense should be prosecuted, and transfer the offense, where appropriate, to the trial or criminal division or to a judge of the court assigned to conduct criminal proceedings, for prosecution of the offense if:

---

7. "1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

"2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

"3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons. . . .

"4. The prosecutive merit of the complaint. . . .

"5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U.S. District Court for the District of Columbia.

"6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

"7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

"8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile . . . by the use of procedures, services and facilities currently available to the Juvenile Court." 383 U.S. at 566-67.

8. There is some ambiguity as to the weight to be accorded to the specific standards cited by the Supreme Court because even the District Courts in the District of Columbia had abandoned those criteria before *Kent* was handed down. See Schornhorst, supra, at 604, n. 127.

"(1) The child was fourteen or more years of age at the time of the alleged conduct; and

"(2) A hearing on whether the transfer should be made is held in conformity with this act; and

"(3) Notice in writing of the time, place, and purpose of the hearing is given to the child and his parents ... at least three days before the hearing; and

"(4) The court finds that there is a prima facie case that the child committed the delinquent act alleged, and the court finds that there are reasonable grounds to believe that: (i) the child is not amenable to treatment, supervision or rehabilitation as a juvenile through available facilities[;] in determining this the court may consider age, mental capacity, maturity, previous record and probation or institutional reports; (ii) the child is not commitable to an institution for the mentally retarded or mentally ill, and (iii) the interests of the community require that the child be placed under legal restraint or discipline or that the offense is one which would carry a sentence of more than three years if committed as an adult."

III

Counsel for appellant invites this Court to assess the substantive merits of the transfer of appellant in the instant case. He suggests that the testimony of the probation officer is sufficient for us to rule that appellant is amenable to treatment within the juvenile system. The issue is a complex one; I am, therefore, hesitant to decide the substance of appellant's claim without a complete record and statement of reasons from the Juvenile Court.

Thus, I would remand the case to the Juvenile Court for rehearing on the issue of appellant's amenability to treatment. Stated simply, the Juvenile Court's opinion does not amount to a finding that "the child is not amenable to treatment, supervision or rehabilitation as a juvenile through available facilities. ..." as required by statute, nor to a statement of reasons as mandated by

*Kent.* The Juvenile Court's recitation of the "fact" that the juvenile is "not amenable to treatment . . ." does not "demonstrate . . . that the question has received the careful consideration of the Juvenile Court" as specifically required by *Kent,* at 561. Cf., *Freeman Appeal,* supra.[9]

Aside from testimony as to the seriousness of the offense, the Juvenile Court heard no evidence that the appellant was not amenable to treatment as a juvenile. The only revelant testimony was the probation officer's recommendation that jurisdiction be retained in the juvenile system. Our statute does not permit a juvenile to be certified to criminal court solely because of the nature of the offense. 11 P.S. §50-325, supra. We do not give up hope that a juvenile may be rehabilitated *unless there is an affirmative showing that the juvenile cannot be treated in an available juvenile facility.* Due process and our statute require "a scientific evaluation of whether the youth will respond successfully to a juvenile court disposition, [not] a front for society's insistence on retribution or social protection." TASK FORCE REPORT: Juvenile Delinquency and Youth Crime (1967), at 24. Seriousness of the offense is not dispositive of whether a juvenile is amenable to treatment.[10] Except in the instance of murder

---

9. Although not specifically appealed from, the Juvenile Court's refusal to hear the report of the clinical psychologist is particularly troubling to this Court. The record contains a dearth of information upon which to make the critical statutory finding that appellant was or was not amenable to treatment in the juvenile system. While the clinical psychologist's report would not have been binding on the court, the report, opposed by neither party, may have been the most relevant information available on the question of amenability to treatment.

10. Were seriousness of the offense alone sufficient to justify a transfer to criminal court, the Supreme Court in *Kent* would not have remanded for further proceedings. Kent, already on probation, admitted committing numerous serious offenses, including burglary and rape. Moreover, research indicates that the seriousness of the offense may not correlate with the offender's capacity

(see 11 P.S. §50-325(e)),[11] a finding of nonamenability must be premised on data other than the nature of the offense involved before a juvenile can be transferred.[12]

The case should be remanded to the Juvenile Court for proceedings consistent with this opinion.

CERCONE, J., joins in this dissenting opinion.

---

CONCURRING AND DISSENTING OPINION BY SPAETH, J.:

I do not know why the hearing judge refused to hear the report by the clinical psychologist, particularly when

---

for rehabilitation. See, e.g., Sargent & Gordon, *Waiver of Jurisdiction, An Evaluation of the Process in the Juvenile Court*, 9 Crime & Delinquency 121 (1963), wherein the authors suggest that certain classes of offenders, such as juvenile murderers, are ideal prisoners and are low rate recidivists upon release.

11. In *Commonwealth v. Pyle*, 462 Pa. 613, 342 A.2d 101 (1975), the Supreme Court addressed the reverse situation as that involved in the instant case. Under §50-303, jurisdiction over a juvenile charged with murder is initially in the criminal court. *Commonwealth v. Pyle* discussed the relevant standards to be used when the juvenile seeks to be transferred to the *juvenile court*: ". . . it becomes the juvenile's burden to show that he does not belong in the criminal court. In other words, it is the youth who must prove that he belongs in the juvenile setting by showing his *need* and *amenability* to the 'program of supervision, care and rehabilitation' which he would receive as a juvenile." 462 Pa. at 624, 342 A.2d at 106 (footnotes omitted). The Court recognized the continued validity of *Kent*. The Court held that appellant-Pyle had not met his burden; the opinion simply did not address the problem with which this Court is faced in the instant case.

12. The statute specifically mentions age, mental capacity, maturity, previous record, and probation or institutional reports as other relevant factors in the Juvenile Court judge's waiver decision. 11 P.S. §50-325(a)(4)(i). Here, appellant was very young, showed good mental ability, exhibited immaturity in that he was led into the plot by older peers, and had no prior contact with the criminal system. The prognosis on these facts would at least superficially seem to indicate a good chance that appellant would be susceptible to rehabilitative efforts.

counsel for the Commonwealth and appellant's counsel had both agreed that the report might be read into the record. Without the report it is difficult to appraise, in fact, I do not see how one can appraise, the judge's finding that appellant "is not amenable to treatment, supervision or rehabilitation through available facilities for juveniles, except the State Correctional Institution at Camp Hill. . . ." I would therefore remand for another certification hearing, with instructions, first, that the hearing judge permit both the Commonwealth and appellant's counsel to offer evidence on appellant's amenability to treatment, supervision or rehabilitation, and second, that findings of fact be made, reflecting the judge's appraisal of that evidence; in the meantime, however, I would not disturb the conviction. This is comparable to the procedure that I think should be followed in cases where a sentencing judge has not given a reasoned statement explaining the sentence. *See* my dissenting opinion in *Commonwealth v. Riggins,* 232 Pa. Superior Ct. 32, 40, 332 A.2d 521 (1974). I agree with Judge PRICE, that we should not reverse the hearing judge except for an abuse of discretion, and Judge PRICE may be correct in his opinion that there was no abuse here (his opinion at 297) ; however, on the present record, I cannot tell. On a limited remand this could be cleared up.