299 A.2d 560 (1973)
S**** S**** and L**** B****
v.
STATE of Maine and Dorothy Hanauer.
Supreme Judicial Court of Maine.
January 22, 1973.
*561 Peter Avery Anderson, Bangor, George S. Johnson, Skowhegan, for plaintiffs.
Courtland D. Perry, Asst. Atty. Gen., Augusta, for the State.
Marvin H. Glazier, Bangor, for amicus curiae.
Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK, ARCHIBALD, JJ.
POMEROY, Justice.
These consolidated cases are before us on report pursuant to Rule 72(b), Maine Rules of Civil Procedure.
The Agreed Statement describes the issues presented as follows:
"1. Whether the offense for which S**** S**** and L**** B**** were adjudged juvenile offenders is unconstitutionally vague, and thus, their commitments are in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 1, § 6-A of the Maine Constitution.
"2. Whether S**** S**** and L**** B**** were adjudged juvenile offenders in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 1, § 6-A of the Maine Constitution, insofar as the conduct upon which the judgment of the Juvenile Court rested would not have been a criminal offense if committed by an adult.
"3. Whether S**** S**** and L**** B**** were adjudged juvenile offenders in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, § 6-A of the Maine Constitution insofar as the conduct upon which the judgment of the Juvenile Court rested would not have been a criminal offense if committed by an adult."
This Court is charged by the rule with rendering such decision as the rights of the party require.
Both cases originated by the filing of a petition for a writ of habeas corpus (post-conviction).
We note from the pleadings that both petitioners were adjudged juvenile offenders in the Juvenile Court on the basis of a petition which alleged in each case the petitioners were juveniles within the meaning of 15 M.R.S.A. 2502-(4).
The petition alleged in each case the juvenile was "living in circumstances of manifest danger of falling into habits of vice or immorality." No other material circumstances of the cases are presented in the record before us. We are not informed by the record exactly what conduct of the juveniles was alleged in the petitions as supporting the conclusory allegation. Suffice it to say the cases as *562 presented to this Court raise no issue as to the legal sufficiency of the petitions.
We are confronted then with a facial attack on the constitutionality of 15 M.R.S. A. 2552 insofar as it purports to give jurisdiction to juvenile courts to treat as a juvenile offender, a juvenile whose conduct is described therein as "living in circumstances of manifest danger of falling into habits of vice or immorality."
The petitioners argue the reference section of the statute is unconstitutionally vague. The briefs filed on behalf of the petitioners equate the reference language to that found unconstitutionally vague in Knowlton v. State, Me., 257 A.2d 409 (1969) and in State v. Aucoin, Me., 278 A.2d 395 (1971).
The arguments advanced prompt us to reexamine our juvenile law system.
The social problem created by the conduct of the deviant child, i. e., a child whose conduct is antisocial, is not a problem which has come into being this year or this decade or even this century. It has existed in this country since our beginning days and has occupied the attention of jurists and sociologists perhaps more than any other single problem.
Most textwriters agree the opening of the New York House of Refuge in 1825 was the first great event in child welfare appearing before the Civil War. Schneider, The History of Public Welfare in New York State 1609-1866 at 317 (1938).
In 1839 the Supreme Court of Pennsylvania had before it a habeas corpus petition directed to the keeper and managers of the "House of Refuge" brought on behalf of one Mary Ann Crouse, a juvenile, alleging that she was unlawfully detained in that institution. The Crouse girl had been committed to the "House of Refuge" by a Justice of the Peace Court on the basis of a complaint signed by the child's mother that,
"The said infant by reason of vicious conduct has rendered her control beyond the power of the said complainant and made it manifestly requisite that from regard to the moral and future welfare of the said infant she should be placed under the guardianship of the House of Refuge."
The constitutionality of the statute authorizing the Court's action was attacked. The Per Curiam opinion of the Court Ex parte Crouse, 4 Wharton 9 (Pa.1839) held the statute constitutional. The rationale for such conclusion was as follows:
"The House of Refuge is not a prison, but a school. Where reformation, and not punishment, is the end, it may indeed be used as a prison for juvenile convicts who would else be committed to a common gaol; and in respect to these, the constitutionality of the act which incorporated it, stands clear of controversy. It is only in respect of the application of its discipline to subjects admitted on the order of the court, a magistrate or the manager of the Almshouse, that a doubt is entertained. The object of the charity is reformation, by training its inmates to industry; by imbuing their minds with principles of morality and religion; by furnishing them with means to earn a living; and, above all, by separating them from the corrupting influence of improper associates. To this end may not the natural parents, when unequal to the task of education, or unworthy of it, be superseded by the parens patriae, or common guardian of the community?"
The Court's opinion concluded with this statement:
"The infant has been snatched from a course which must have ended in confirmed depravity; and, not only is the restraint of her person lawful, but it would be an act of extreme cruelty to release her from it."
Thus, the parens patriae concept became imbedded in the law as justification for the use of State power to remove children from the environment in which they were *563 found and place them in an environment chosen by the State.
In 1899 the first Juvenile Court was established in the State of Illinois by the Act of April 21, 1899. 1899 Ill.Laws 131. Other juvenile courts followed.
The Pennsylvania statute of 1903 (1903 P.L. 274), was examined as to its constitutionality by the Supreme Court of Pennsylvania in Commonwealth v. Fisher, 213 Pa. 48, 62 A. 198 (1905). That statute which followed generally the pattern established by the Illinois Act, was attacked because:
(a) under its provision the defendant was not taken into court by due process of law,
(b) he was denied his right of trial before a jury on a charge of the felony on which he had been arrested, and
(c) the act provides different punishments for the same offense by the classification of individuals according to age.
Other reasons for the claimed unconstitutionality were advanced but these are not of concern here.
That Court treated with the objections raised as follows:
"The objection that `the act offends against a constitutional provision in creating, by its terms, different punishments for the same offense by a classification of individuals,' overlooks the fact, hereafter to be noticed, that it is not for the punishment of offenders but for the salvation of children, and points out the way by which the state undertakes to save, not particular children of a special class, but all children under a certain age, whose salvation may become the duty of the state, in the absence of proper parental care or disregard of it by wayward children. No child under the age of 16 years is excluded from its beneficent provisions. Its protecting arm is for all who have not attained that age and who may need its protection. It is for all children of the same class. That minors may be classified for their best interests and the public welfare has never been questioned in the legislation relating to them. Under the act of 1887, the classification of females under 16 years of age means felonious rape, with its severe penalties for what may be done one day, though on the next it remains simple fornication, to be expiated by a mere fine. Other acts forbid the employment of minors under 12 years of age in mills; of any boy under 14, or any female, in anthracite coal mines; of minors under 14 in and about elevators; of a boy under 12, or any female, in bituminous coal mines. Others make it a misdemeanor to furnish intoxicating drinks, by sale, gift, or otherwise, to one under 21, and forbid the admission of any minor into certain places of amusement. Such classification is not prohibited by the Constitution, and what has not been therein prohibited the Legislature may enact."
As to the due process claim, the Court said:
"In pressing the objection that the appellant was not taken into custody by due process of law, the assumption, running through the entire argument of the appellant, is continued that the proceedings of the act of 1903 are of a criminal nature for the punishment of offenders for crimes committed, and that the appellant was so punished. But he was not, and he could not have been without due process of law; for the constitutional guaranty is that no one charged with a criminal offense shall be deprived of life, liberty, or property without due process of law. To save a child from becoming a criminal, or from continuing in a career of crime, to end in maturer years in public punishment and disgrace, the Legislature surely may provide for the salvation of such a child, if its parents or guardian be unable or unwilling to do so, by bringing it into one of the courts of the state without any process *564 at all, for the purpose of subjecting it to the state's guardianship and protection. The natural parent needs no process to temporarily deprive his child of its liberty by confining it in his own home, to save it and to shield it from the consequences of persistence in a career of waywardness; nor is the state, when compelled, as parens patriae, to take the place of the father for the same purpose, required to adopt any process as a means of placing its hands upon the child to lead it into one of its courts. When the child gets there, and the court, with the power to save it, determines on its salvation, and not its punishment, it is immaterial how it got there. The act simply provides how children who ought to be saved may reach the court to be saved. If experience should show that there ought to be other ways for it to get there, the Legislature can, and undoubtedly will, adopt them, and they will never be regarded as undue processes for depriving a child of its liberty or property as a penalty for crime committed."[1]
In answering the final objection the Court in Fisher said:
"The last reason to be noticed why the act should be declared unconstitutional is that it denies the appellant a trial by jury. Here again is the fallacy that he was tried by the court for any offense. `The right of trial by jury shall remain inviolate,' are the words of the Bill of Rights, and no act of the Legislature can deny this right to any citizen, young or old, minor or adult, if he is to be tried for a crime against the commonwealth. But there was no trial for any crime here, and the act is operative only when there is to be no trial. The very purpose of the act is to prevent a trial, though, if the welfare of the public require that the minor should be tried, power to try it is not taken away from the court of quarter sessions; for the eleventh section expressly provides that nothing in the preceding sections `shall be in derogation of the powers of the courts of quarter sessions and oyer and terminer to try, upon an indictment, any delinquent child, who, in due course, may be brought to trial.' This section was entirely unnecessary, for without it a delinquent child can be tried only by a jury for a crime charged; but, as already stated, the act is not for the trial of a child charged with a crime, but is mercifully to save it from such an ordeal, with the prison or penitentiary in its wake, if the child's own good and the best interests of the state justify such salvation. Whether the child deserves to be saved by the state is no more a question for a jury than whether the father, if able to save it, ought to save it. If the latter ought to save, but is powerless to do so, the former, by the act of 1903, undertakes the duty; and the Legislature, in directing how that duty is to be performed in a proper case, denies the child no right of a trial by a jury, for the simple reason that by the act it is not to be tried for anything. The court passes upon nothing but the propriety of an effort to save it, and, if a worthy subject for an effort of salvation, that effort is made in the way directed by the act. The act is but an exercise by the state of its supreme power over the welfare of its children, a power under which it can take a child from its father and let it go *565 where it will, without committing it to any guardianship or any institution, if the welfare of the child, taking its age into consideration, can be thus best promoted."
Between Crouse and Commonwealth v. Fisher, supra, a telling assault was made on parens patriae in People ex rel. O'Connell v. Turner, 55 Ill. 280, 8 Am.Rep. 645 (1870). This case arose from a habeas corpus petition.
The impact of this decision on judicial attitudes concerning juvenile justice was relatively minor except in the State of Illinois.[2]
The O'Connell Court had said:
"The warrant of commitment does not indicate that the arrest was made for a criminal offense. Hence, we conclude that it was issued under the general grant of power, to arrest and confine for misfortune." (Emphasis supplied)
Crouse had justified government custody of children on the basis that it was the responsibility of the state as parens patriae to treat antisocial conduct in children as an incipient social threat.
O'Connell treated antisocial behavior in children as a misfortune to be viewed as one of life's cruelties visited upon children. That the child was taken into custody of the State and his liberty circumscribed by the State constituted impermissible restraint upon natural liberty and was forbidden by the Constitution.
Such a restraint on natural liberty, the O'Connell Court said, "is tyranny and oppression."
The philosophy of the O'Connell Court is made manifest in a paragraph appearing at page 283 of the opinion in 55 Ill.,
"What is proper parental care? The best and kindest parents would differ, in the attempt to solve the question. No two scarcely agree; and when we consider the watchful supervision, which is so unremitting over the domestic affairs of others, the conclusion is forced upon us, that there is not a child in the land who could not be proved, by two or more witnesses, to be in this sad condition. Ignorance, idleness, vice, are relative terms. Ignorance is always preferable to error, but, at most, is only venial. It may be general or it may be limited. Though it is sometimes said, that `idleness is the parent of vice,' yet the former may exist without the latter. It is strictly an abstinence from labor or employment. If the child perform all its duties to parents and to society, the State has no right to compel it to labor. Vice is a very comprehensive term. Acts, wholly innocent in the estimation of many good men, would, according to the code of ethics of others, show fearful depravity. What is the standard to be? What extent of enlightenment, what amount of industry, what degree of virtue, will save from the threatened imprisonment? In our solicitude to form youth for the duties of civil life, we should not forget the rights which inhere both in parents and children. The principle of the absorption of the child in, and its complete subjection to the despotism of, the State, is wholly inadmissible in the modern civilized world."
It is by this language the predictive system which was the basis on which Crouse was decided, was rejected in O'Connell.
The first appearance of an attempt to deal with the juvenile problem separate from the criminal process in Maine, appears in Acts and Resolves of Maine, 1853, c. 19, bearing the title, An Act to Establish the State Reform School. Section 4 of the Act provided as follows:
"After proclamation shall have been made as provided in the third section of this act, when any boy or youth under *566 the age of eighteen years shall be convicted of any offense known to the laws of this state, and punishable by imprisonment, other than such as may be punished by imprisonment for life, the court, (or justice, as the case may be,) before whom such conviction shall be had, may at their discretion, sentence such boy or youth to the state reform school, or to such punishment as is now provided by law for the same offense. And if the sentence shall be to the reform school, then it shall be in the alternative, to the state reform school, or to such punishment as would have been awarded if this act had not been passed. Provided, however, that no justice of the peace shall sentence to the reform school for the offense of assault and battery."
Later by Acts and Resolves of Maine, 1871-73, chap. 141, entitled An Act Relating to Maine Industrial School for Girls, the Legislature of Maine first used the phrase, "has been found in circumstances of manifest danger of falling into habits of vice or immorality."
Section 1 of that Act provided as follows:
"A parent or guardian of any girl between the ages of seven and fifteen years, or the municipal officers or any three respectable inhabitants of any city or town where she may be found may complain in writing to the judge of probate or any trial justice in the county, or to the judge of the municipal or police court for the city or town, alleging that she is leading an idle, vagrant or vicious life, or has been found in circumstances of manifest danger of falling into habits of vice or immorality, and request that she may be committed to the guardianship of the Maine Industrial School for Girls. The judge or justice shall appoint a time and place of hearing, and order notice thereof to any person entitled to be heard, and at such time and place may examine into the truth of the allegations of said complaint, and if satisfactory evidence thereof is adduced and it appears that the welfare of such girl requires it, he may order her to be committed to the custody and guardianship of the officers of said school during her minority, unless sooner discharged by process of law."
The Juvenile Court in Maine came into being by the provisions of chap. 241, Laws of Maine, 1931.
In 1939 by chap. 270, Laws of Maine, 1939, the Legislature provided for commitment of boys to the State School for Boys as well as girls to the Hallowell State School for Girls, when such boy or girl "has been found in circumstances of manifest danger of falling into habits of vice or immorality."
In Wade v. Warden of State Prison, 145 Me. 120, 73 A.2d 128, (1950), this Court described the purpose of juvenile courts and laws relating to juvenile delinquency as follows:
"The purpose of juvenile courts, and laws relating to juvenile delinquency, is to carry out a modern method of dealing with youthful offenders, so that there may be no criminal record against immature youth to cause detrimental local gossip and future handicaps because of childhood errors and indiscretions, and also that the child who is not inclined to follow legal or moral patterns, may be guided or reformed to become, in his mature years, a useful citizen.
"The work of the judge of a municipal court, sitting as the judge of a juvenile court, is vitally important to the welfare of our state. He does not pass upon the crimes and misdemeanors of childhood wholly from the legal standpoint. The basic and primary idea of the legislature is salvation, not punishment. The nature of juvenile work is more philanthropic than the work of the common law jurist. The legislature of Maine has therefore placed this authority in the hands of men who know humanity and can inspire the *567 child with confidence and with a desire, in most instances, to become an upright citizen."
Thus, it is clear Maine long has been one of the many states adhering to the predictive system first espoused in Crouse.
In 1967 the Supreme Court of the United States handed down what has come to be considered a landmark decision in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527. Basically, the holding in that case was that juveniles have the right to counsel at the adjudicatory phase of a juvenile proceeding.
As Mr. Justice Roberts said of it in writing for the Supreme Court of Pennsylania in In re Terry and McKeiver, 438 Pa. 339, 265 A.2d 350 (1970):
"The decision is somewhat of a paradox, being both broad and narrow at the same time."
The Court specifically enumerated as due process rights applicable to the adjudicatory stage of juvenile proceedings:
(a) Adequate and timely notice of charges;
(b) Right to counsel;
(c) Right to confrontation cross-examination, and
(d) Privilege against self-incrimination.
The petitioners in the case before us and many critics of Gault interpret Gault as the occasion for the demise of parens patriae.[3]
This widely held belief was strengthened by the decision of the Supreme Court in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which expressly held that proof beyond a reasonable doubt was required as a condition of adjudication that a juvenile is a juvenile offender. The narrow issue of that case was described by Mr. Justice Brennan writing for a majority of the Court when he said:
"This case presents the single, narrow question whether proof beyond a reasonable doubt is among the `essentials of due process and fair treatment' required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult."
The true meaning of Gault and Winship was described by the Supreme Court of the United States, speaking through Mr. Justice Blackmun in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), as follows:
"The Court has refrained, in the cases heretofore decided, from taking the easy way with a flat holding that all rights constitutionally assured for the adult accused are to be imposed upon the state juvenile proceeding. What was done in Gault and in Winship is aptly described in Commonwealth v. Johnson, 211 Pa.Super. 62, 74, 234 A.2d 9, 15 (1967):
`It is clear to us that the Supreme Court has properly attempted to strike a judicious balance by injecting procedural orderliness into the juvenile court system. It is seeking to reverse the trend [pointed out in Kent [Kent v. United States] 383 U.S. 541 at 556, 86 S.Ct. 1045 at 1054, 16 L.Ed.2d 84 at 94] whereby "the child receives the worst of both worlds.. . ."'
"There is a possibility, at least, that the jury trial, if required as a matter of constitutional precept, will remake the juvenile proceeding into a fully adversary process and will put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding."
The United States Supreme Court has thus made it abundantly clear that Maine *568 is free to pursue the course chartered so long ago in its resolution of the problem of juvenile deviants subject only to the requirement that due process be observed in all juvenile proceedings. We see nothing remarkable or new about this requirement. We had thought it long since established that the State in taking any State action is required to observe governmental fairness. See for example Kovack v. City of Waterville, 157 Me. 411, 422, 173 A.2d 554 (1961).
The petitioners here clearly equate due process requirements in juvenile proceedings with the well established due process requirements of criminal proceedings. With this contention we do not agree.
The petitioners further argue that because a juvenile proceeding can result in restrictions upon a juvenile's liberty or even his loss of liberty, the conclusion is compelled that the due process requirements of criminal prosecution must apply. We answer this by saying it is not every loss of liberty which gives rise to an application of the standards of due process required in criminal proceedings. Just as the natural parent may constitutionally place limitation on the child's freedom of locomotion and may substitute the will and judgment of the parent for that of the child and thus constrain the child's will for his own protection, so also may the State in the exercise of its parens patriae guardianship. The juvenile proceeding is not a criminal proceeding. Its purpose is not punishment. "The basic and primary idea of the legislature is salvation, not punishment." Wade v. Warden of State Prison, supra.
It, therefore, follows that the due process requirements of the Constitution must be equated to this sui generis proceeding and not to a criminal proceeding.
The statute with which we are here concerned calls for the protective facilities of the State to come into play whenever a juvenile, as defined by the Act, commits an offense and whenever the conduct of the juvenile is such that he or she is living in circumstances of manifest danger of falling into habits of vice or immorality. The statute does not relate to a status. By its express terms it relates to conduct of the juvenile. It treats with a class of persons, i. e., a person under the age of 17 in whom the State has asserted a special protective interest with constitutional validity.
The statute is unconstitutionally vague on its face even if the strictest standard applicable to criminal proceedings were to be followed only if when considering this limited class of persons, i. e., persons under the age of 17, men and women of common intelligence can only guess as to its meaning. The due process clause of the Constitution does not permit legislation which purports to regulate human conduct with sanctions imposed for violation to stand as valid if "men of common intelligence must necessarily guess at its meaning." Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).
If no standard of conduct is specified at all, legislation is unconstitutionally vague. It is valid legislation, however, if it requires a person to conform his conduct to an imprecise but comprehensible normative standard. Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).
We conclude that when applied to this class, the language of the statute is sufficiently definite to withstand constitutional attack on grounds of vagueness.
The meaning of the reference phrase becomes clear when one considers the history and purpose of our juvenile laws. The basic purpose of affording juveniles special treatment is that the State as parens patriae has a duty to avoid giving children criminal records and, insofar as possible, prepare the child to cope with life and not become a criminal in his adult years.
*569 The Legislature accords special treatment to those juveniles whose conduct would be criminal if done by an adult, and based on the predictive concept, offers its preventive and corrective facilities to those juveniles whose conduct, if unchanged, is likely to become criminal when the child becomes an adult. Thus, the conduct of a juvenile which constitutes living in circumstances of manifest danger of falling into habits of vice or immorality means conduct of the juvenile while living in circumstances which make it clear that if such conduct is continued, there is manifest danger of falling into habits of criminal conduct  such conduct being considered vice and immorality.
The terms vice or immorality mean those vices and those immoral acts which are defined by statute as criminal and the constituent elements of which are clearly described in the statute and in the case law interpreting the statute or by common law definition.[4]
Stated simply, the judgment which must be made by the juvenile judge is: On the basis of the allegations of the petition and the facts presented in support thereof, has the juvenile demonstrated a pattern of conduct which manifests or makes clear to all reasonable men that if persisted in and not changed, there is real danger that the conduct will, when the child becomes an adult, bring about violation of the criminal statutes?
The proceedings must be initiated by the filing of a verified petition which must contain a "plain statement of the facts which bring the juvenile complained against within chapters 401 to 409." (15 M.R.S.A. 2602)[5]
Thus, it may be said the petition must state facts demonstrating that the juvenile's conduct constitutes "living in circumstances of manifest danger of falling into habits of vice or immorality."
Appeal procedure is provided by the statute: The sufficiency of the allegations of the petition to establish that the conduct is, in fact, "living in circumstances of manifest danger of falling into habits of vice or immorality" is easily tested by reference to the facts alleged in the petition.
*570 The petitioners' complaint that there is denial of equal protection of the law because the conduct sufficient to bring the juvenile within the ambit of the juvenile statute would not have been a criminal offense, if committed by an adult, is answered by pointing out that the child is not charged with criminal conduct.
The statute merely provides that the protective custody of the State shall come into play whenever there is conduct manifesting a danger that if persisted in, it will become criminal when the child becomes an adult.
Much of the petitioners' brief is dedicated to an attempt to demonstrate that the predictive system has failed and as Mr. Justice Fortas said in Gault, the child winds up with the worst of two worlds. We concede that the statistics cited in Gault make a powerful case for the conclusion that the juvenile offender system has been neither well funded nor well administered. Despite this impressive documentation, our faith in the soundness of the predictive system is not shaken. We think no reasonable man would shoot a sound horse because his saddle stirrup needs repairs. The only alternative it seems to us would be to take what Mr. Justice Blackmun described as the easy way and to flatly hold the full scope of rights constitutionally assured for the adult accused in criminal proceedings are to be imposed on this State's juvenile proceedings. This would be overlooking the difference in substance as well as procedure in the two. In fact, the criteria for determining due process requirements of non-criminal proceedings by the State are the same for children as for adults.
We fear, should deviant children be diverted to the criminal processes, great social harm would result.
By the Act of 1854 (Acts and Resolves of Maine 1853) and by the Act of 1931 (Laws of Maine 1931, chap. 241) Maine embarked upon a humanitarian program designed to save deviant children from a life of adult lawlessness. To make the program feasible it required children to give up some rights they had formerly enjoyed when they were treated through the criminal process. Thus, the State by law committed itself to
". . . carry out a modern method of dealing with youthful offenders, so that there may be no criminal record against immature youth to cause detrimental local gossip and future handicaps because of childhood errors and indiscretions, and also that the child who is not inclined to follow legal or moral patterns, may be guided or reformed to become, in his mature years, a useful citizen." Wade v. Warden, supra.
To divert children back into the stream of criminal process would surely result in restoration of all the constitutional safeguards accorded adult criminals, but we fear it would have the effect of diverting public attitudes from the humanitarian goal of providing a helping hand to the deviant young.[6]
*571 We have the same sentiments as those expressed by Mr. Justice Roberts speaking for the Pennsylvania Court in In re Terry, supra.
We are confident that a properly structured and fairly administered juvenile court system can serve our needs without infringing on individual freedoms. The time may come when we are disabused of our belief that the potential for growth inherent in the juvenile system cannot be ignored.
That time has not yet come.
This facial attack on this statute must fail.
The entry must be,
Writ of Habeas Corpus denied in both cases.
DUFRESNE, Chief Justice (dissenting).
The minor female petitioners, one nearly 16 years of age and the other 14½, were committed to the Stevens School for the term of their minority in the District Court sitting as a Juvenile Court. 15 M. R.S.A. §§ 2611(4, par. B), 2714. Their commitment to the School followed an adjudication by the Judge of the Juvenile Court that they had committed the juvenile offense of "living in circumstances of manifest danger of falling into habits of vice or immorality." 15 M.R.S.A. § 2552. They respectively instituted petitions for a writ of habeas corpus to set aside their "conviction" (adjudication of guilt of a juvenile offense) and commitment to the Stevens School on the ground that the juvenile offense for which they were committed is unconstitutionally vague by statutory definition, that the Juvenile Court's adjudication of their guilt of juvenile offenses was in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution as well as of Article 1, Section 6-A of the Maine Constitution. The cases were consolidated on report to this Court.
The instant report clearly demonstrates by express averment in the agreed statement of facts and in the petitions for the writ of habeas corpus that these juveniles were brought before the District Court sitting as a Juvenile Court
"by a Petition alleging that she was `living in circumstances of manifest danger of falling into habits of vice and immorality.'" (Emphasis added.)
The respondents' answer does not dispute this, but expressly admits it,
"stat[ing] affirmatively that `living in circumstances of manifest danger of falling into habits of vice or immorality' is not a criminal offense * * *, but is conduct appropriately and constitutionally within the jurisdiction of the Juvenile Court and upon which adjudication and disposition may be constitutionally made." (Emphasis supplied.)
The agreed statement of facts further observes that the Court's adjudication itself was on a specific finding that the juveniles had committed the conduct
"described as follows in 15 M.R.S.A. 1964, § 2552: `living in circumstances of manifest danger of falling into habits of vice or immorality.'"
The only reasonable interpretation to be given to such a report, it seems to me, with due respect to my colleagues, is that the petition before the Juvenile Court, in the totality of its allegations, merely charged the juvenile offense in the language of the statute and was violative of Section 2602, *572 Title 15, M.R.S.A., which requires the verified petition to contain
"[a] plain statement of the facts which bring the juvenile complained against within chapters 401 to 409; * * *"
This Court concedes that "the petition must state facts demonstrating that the juvenile's conduct constitutes `living in circumstances of manifest danger of falling into habits of vice or immorality.'" I infer from the Court's ruling that, absent such specificity in the petition, the juvenile proceedings would be violative, not only of the reference statute, but also of due process, and an adjudication based on such a defective charging instrument would be a nullity.
The Court's reading into the instant report the fact that the petitions before the Juvenile Court alleged particulars of conduct to support the conclusory statement that the respective juveniles were living in circumstances of manifest danger of falling into habits of vice or immorality is not supported by the record, nor was such a fact suggested by the parties either at oral argument or in their briefs.
In the posture in which the case is presented to us, I would discharge the report and refrain from rendering an advisory opinion respecting the constitutionality of the juvenile offender statute (15 M.R.S.A., § 2552). Although I agree that the resolution of this constitutional question would serve a useful purpose in giving guidance to future police activity in the field of juvenile control and to the juvenile courts in the administration of the juvenile offense system, nevertheless, if the present procedural device to obtain the opinion of the Law Court upon the constitutionality of statutes by limiting the thrust of attack to the face of the statutes without full supplement of the facts giving rise to their application is presently approved, I view this with alarm as an unwise departure from a salutary policy of long standing in this Court. See, Fidelity & Casualty Company v. Bodwell Granite Company, 1906, 102 Me. 148, 66 A. 314.
Initially, may I note that the absence, in the instant report, of the complete recital of the petitions before the Juvenile Court (since this Court is reaching out by implication and surmise that the petitions did in fact specify conduct which supported the charge that the juveniles were living in manifest danger of falling into habits of vice and immorality), is a definite breach of Rule 72(b), which conditions reports to this Court on the occasion 
"where there is agreement as to all material facts." 
If the petitions before the Juvenile Court contained allegations of fact beyond the mere recital of the statutory conclusory language, then the instant report does not reflect an agreement "as to all material facts."
Where the report does not unequivocally support this Court's interpretation of the facts agreed upon by the parties, it should not be entertained, since the Court has not before it the necessary information for the application of the judicial policy of this Court to decline to pass upon the question of constitutionality of a statute unless this is entirely necessary to a decision of the cause in which it is raised. Johnson v. Maine Wetlands Control Board, 1969, Me., 250 A.2d 825. See, Chaplin, Judge of Probate v. National Surety Corporation, 1936, 134 Me. 496, 185 A. 516.
In State v. Hopkins, 1958, 154 Me. 317, 147 A.2d 450, the criminal complaint charging speeding on the Maine Turnpike did not allege that the rules and regulations of the Maine Turnpike Authority were ever published. Even in the face of contentions that serious constitutional questions were involved arising out of the alleged delegation of legislative power to the Authority, this Court said:
"Following well defined and established precedents, we hold that when reasons are apparent for sustaining a demurrer *573 without resort to any constitutional question, the latter issue is not reached." (Emphasis mine.)
In State v. White, 1971, Me., 280 A.2d 810, the parties had raised on report two issues, 1) that the statute proscribing "disorderly conduct" was constitutionally invalid as impermissibly vague and overbroad, and 2) that the complaint was legally insufficient to charge any criminal offense. Identical issues are presented in this case respecting the juvenile offender statute in connection with the juvenile offense of "living in circumstances of manifest danger of falling into habits of vice or immorality." In White, Mr. Justice Webber for a unanimous court applied the well established rule that questions of constitutional law should not be passed upon unless strictly necessary to a decision of the cause under consideration and dismissed the complaint, but declined to rule on the constitutionality of the statute. The Court there said:
"the complaint fails to inform either the respondent or the Court as to what acts involving respondent's conduct or language are said to have occurred and to have amounted to disorderly conduct, the ultimate fact. The importance of this requirement becomes apparent when we consider that many forms of conduct and language, although distasteful to certain individuals or even to a majority of people, are nevertheless afforded constitutional protection. [Obviously, similar conclusions could be reached with respect to juvenile conduct.] The complaint must be worded with a sufficient specificity to enable the Court to make such a determination."
This judicial policy has been adhered to and not departed from (except for strong reason and under extraordinary circumstances such as were present in Morris v. Goss, 1951, 147 Me. 89, 83 A.2d 556). See, Vigue v. Chapman, 1941, 138 Me. 206, 24 A.2d 241; Inhabitants of Town of Warren v. Norwood, 1941, 138 Me. 180, 24 A.2d 229; Payne v. Graham, 1919, 118 Me. 251, 107 A. 709, 7 A.L.R. 516.
Where the facts are not fully or adequately stated, this Court will not pass upon the constitutionality of a statute. State v. Bailey, 1972, Me., 286 A.2d 603; State v. Colburn, 1936, 134 Me. 494, 182 A. 210.
I am aware of State v. Aucoin, 1971, Me., 278 A.2d 395, which came before the White decision. But in Aucoin, the complaint was before the Court and did allege conduct beyond the wording of the ordinance. This Court in Aucoin did not attempt to bring the ordinance involved, by means of interpretation of legislative purpose, from its obvious constitutional overbreadth to a more specific meaning that might have passed constitutional muster, and the criminal prosecution was finally concluded by resolving the constitutionality of the ordinance. Furthermore, the Court's last-resort policy in deciding constitutional questions was not referred to in the opinion.
In the instant case, this Court's decision would not bar a subsequent petition by these petitioners for the writ of habeas corpus to test their commitment a second time, if the petition which brought them before the Juvenile Court did in fact charge the juvenile offense only in terms of the statute as I interpret the report.
In Wade v. Warden of State Prison, 1950, 145 Me. 120, 73 A.2d 128, this Court held that juvenile courts are courts of special and limited jurisdiction and authority, and that the statutory requirements provided for its exercise of its duties are jurisdictional and cannot be waived. I am mindful of Willette v. Umhoeffer, 1970, Me., 268 A.2d 617, which, in another context, stated that the issue of jurisdiction must reach finality the same as any other issue and would be subject to the doctrine of res adjudicata. I am also cognizant of 14 M.R.S.A., § 5507, which says
 "All grounds for relief claimed by a petitioner under this remedy must be *574 raised by a petitioner in his original or amended petition, and any grounds not so raised are waived unless the State or Federal Constitution otherwise requires * * *."  (Emphasis put in.)
The Juvenile Court's adjudication of guilt of a juvenile offense upon a petition couched solely in the words of the statute
"living in manifest danger of falling into habits of vice and immorality,"
if such be the fact contrary to this Court's interpretation of the instant report, would render the juvenile proceedings, including the commitment, null and void for want of jurisdiction. As stated in Dow v. State, 1971, Me., 275 A.2d 815, this Court is firmly committed to the rule that jurisdictional questions are always open to judicial scrutiny.
That these petitioners, at the habeas corpus level, voluntarily and understandingly waived before that Court the jurisdictional issue and consented to the presentment of the instant report with the jurisdictional issue in mind, does not appear, and waivers of constitutional rights based upon a silent record will not be countenanced, notwithstanding 14 M.R.S.A., § 5507. Such consent, to be valid, must be given under circumstances evidencing an intentional waiver of a known right and will not be presumed from a silent record. See, Carnley v. Cochran, 1962, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70; Boykin v. Alabama, 1969, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed. 2d 274.
Where this Court narrows the meaning of the juvenile offender statute to meet the due process requirements of the Fourteenth Amendment, it should, at the very least, set aside the reference adjudication and commitment and order the case remanded to the Juvenile Court for a new hearing under the statute as now construed, in order to make sure that the petitioners' commitment be not the result of an unconstitutional construction by the Juvenile Judge of the juvenile offender statute. See, Shuttlesworth v. City of Birmingham, 1965, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176; Ashton v. Kentucky, 1966, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469.
In my view, this Court should not decide the important constitutional issues presented in the instant case without a full record showing distinctly with what specific conduct these petitioners were charged to have been engaged in that led to an adjudication of juvenile delinquency under the statutory provision herein contested, and, for that reason, I would discharge the report or at least remand the case with instructions that the habeas Court give both parties an opportunity to supplement the deficiency in this record. Constitutional questions are not to be dealt with abstractly. Allen-Bradley Local, etc. v. Wisconsin Employment Relations Board, 1942, 315 U.S. 740, 746, 62 S.Ct. 820, 824, 86 L.Ed. 1154; Local No. 8-6, Oil, etc., Workers International Union v. Missouri, 1960, 361 U.S. 363, 370, 80 S.Ct. 391, 396, 4 L.Ed.2d 373.
Seeing that this Court reaches the merits of the problem posited by the parties, I feel it my duty to express my own views on the subject. However, I do so reluctantly, since it is my opinion, with due respect to my colleagues, that this Court is engaging in the giving of an advisory opinion upon a case not "factually" before us.
The reported issue is, whether 15 M.R. S.A. § 2552 prohibiting the following conduct of juveniles
 "living in circumstances of manifest danger of falling into habits of vice or immorality" 
is facially unconstitutional on the ground of vagueness. The Maine Juvenile Act is no different from most of the statutes on the subject in the various states. In certain aspects, the Act is very specific in that it makes it an offense for a juvenile to commit any of the offenses made criminal when committed by adults, plus habitual truancy and repetitive desertion of one's *575 home without just cause, but, then, in an effort to vest a broad discretion in the Juvenile Court, the Legislature extends the definition of a juvenile offense to include an open-ended general concept of offensive conduct such as "behaving in an incorrigible or indecent and lascivious manner", "knowingly and willfully associating with vicious, criminal or grossly immoral people" and "living in circumstances of manifest danger of falling into habits of vice or immorality." We are only concerned with the last portion of the statute.
The "void for vagueness" doctrine, applicable to test the constitutionality of any statutory provision, requires that a statute be sufficiently certain and definite in meaning to afford a reasonable degree of guidance as to just what constitutes the conduct required or prohibited to all involved in its application, to the persons whose activity the statute attempts to regulate, to the courts who must decide rights or obligations under it, and, in the criminal and juvenile sectors, to the police who are charged with its enforcement. Stated otherwise, the rule is that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . ." Connally v. General Construction Co., 1926, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322; United States v. National Dairy Products Corp., 1963, 372 U.S. 29, 32, 83 S.Ct. 594, 598, 9 L.Ed.2d 561.
This Court has equated, at least in criminal jurisprudence, the requirement of reasonable certainty in statutory enactments with due process of law. Knowlton v. State, 1969, Me., 257 A.2d 409.
Reasonable precision in the definition of proscribed conduct for juveniles should occupy a position of the highest order in the scheme of constitutional values, equally so with similar reasonable particularity in the definition of prohibited adult criminal activity. A juvenile's forfeiture of his liberty for committing a juvenile offense is just as weighty on the scales of justice in terms of due process of law as an adult's loss of liberty for conviction of crime. Statutory vagueness in legislation regulating juvenile conduct under penalty of State wardship is equally abhorrent under considerations of fair play, if not more so, as uncertainty in criminal statutes may be to the adult world. Definitional uncertainty in a juvenile offense statute is an open invitation to virtually unfettered administration by the police and arbitrary judicial adjudication by the courts. It lends itself to an unconstitutional delegation of legislative power to the juvenile judge by permitting him to decide without reasonable legislative standards what the law is in each case. It makes for unequal dispensation of justice. All persons are entitled to be informed as to what the State commands or forbids. Lanzetta v. State of New Jersey, 1939, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888.
The "void for vagueness" doctrine applies in any area, including the sphere of juvenile-conduct regulatory legislation. Vague laws in any context suffer a constitutional infirmity. Ashton v. Kentucky, 1966, 384 U.S. 195, 86 S.Ct. 1407 at 1410, 16 L.Ed.2d 469 (criminal libel): see also, cases cited in footnote 1 in Ashton; Jordan v. DeGeorge, 1951, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (deportation case); Giaccio v. State of Pennsylvania, 1966, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (imposition of costs at discretion of jury upon a defendant acquitted of crime); A. B. Small Co. v. American Sugar Refining Co., 1925, 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589; Soglin v. Kauffman, 1969, 7 Cir., 418 F.2d 163 (unconstitutional vagueness of term "misconduct" in state university code of discipline).
The Oregon Court has concluded that a juvenile has the same right to challenge the constitutionality of a juvenile act proscribing behavior endangering his own welfare or the welfare of others as the adult who is prosecuted for the crime of *576 contributing to the identical juvenile conduct made a juvenile offense against the minor child. State v. Oman, 1969, Or., 457 P.2d 496; see also, State v. Hodges, 1969, Or., 457 P.2d 491.
The power of the State to act as parens patriae for the benefit of children and adolescents does not override the constitutional privilege of substantive due process to which minor children are entitled equally as much as adults. In Shone v. State, 1968, Me., 237 A.2d 412, this Court recognized that due process concepts apply in cases of deprivation of liberty other than in criminal cases. See, Sleeper, Appellant, 1952, 147 Me. 302, 87 A.2d 115; City of Portland v. City of Bangor, 1876, 65 Me. 120.
It is contended that the Maine Juvenile Act, in defining juvenile offenses in terms of "living in circumstances of manifest danger of falling into habits of vice or immorality" is unconstitutionally vague and violative of due process, because it imposes a loss of liberty upon the status or mode of life of the juvenile. It is true that, according to Webster's definitions of "living", the term may refer to the "state" of a person, to the "fact of being" in circumstances of manifest danger of falling into habits of vice or immorality. On the other hand, it could refer to the concept of "producing. . . action" which brings about such circumstances. Construing the statute in the light of the benevolent purposes of the juvenile legislation, I do ascribe to the Legislature an intent to proscribe active conduct and not to penalize a juvenile's status as such acquired by the pursuit of a certain pattern of living. Thus, the Act in this area would pass constitutional requirements, provided the definition of the juvenile offense in its totality furnishes the necessary intelligible standards to guide the child, his parents, the police and the courts. See, Knowlton v. State, supra.
In McKeiver v. Pennsylvania, 1971, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647, the Supreme Court of the United States reviewed its prior decisions to determine the impact of the Due Process Clause of the Fourteenth Amendment upon the adjudicative phase of a state juvenile court delinquency proceeding.[1] It concluded:
"1. Some of the constitutional requirements attendant upon the state criminal trial have equal application to that part of the state juvenile proceeding that is adjudicative in nature. Among these are the rights to appropriate notice, to counsel, to confrontation and to cross-examination, and the privilege against self-incrimination. Included, also, is the standard of proof beyond a reasonable doubt. [Emphasis mine.]
2. The Court, however, has not yet said that all rights constitutionally assured to an adult accused of crime also are to be enforced or made available to the juvenile in his delinquency proceeding. Indeed, the Court specifically has refrained from going that far:
`We do not mean by this to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment.'. . . ." [Emphasis supplied.]
The McKeiver Court accentuated the fact that the underlying reason for subjecting the adjudicatory framework of state juvenile delinquency proceedings to the fundamental fairness test of the Due Process Clause was the realization that a determination *577 unfavorable to the juvenile meant the loss of his liberty and commitment to a state institution. The Court further stated that the juvenile's aggregate rights to notice of the charge, to counsel representation, to confrontation of the witnesses, to cross-examination and to the standard of proof beyond a reasonable doubt, were fundamental requirements in any factfinding system properly structured for accuracy of factual determinations. The Court ruled that
"[i]f the jury trial were to be injected into the juvenile court system as a matter of right, it would bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial" * * *
and opined that the "informality, flexibility, or speed" of the juvenile court system as envisioned by the Winship Court would be lost.
I do believe with the McKeiver Court that the objectives of juvenile delinquency acts to
"insure that the juvenile court will operate in an atmosphere which is orderly enough to impress the juvenile with the gravity of the situation and the impartiality of the tribunal and at the same time informal enough to permit the benefits of the juvenile system to operate"
can be reached, while at the same time constitutional fundamental fairness, which requires reasonable certainty and definiteness in legislative enactments, is assured, a condition in no way affecting adversely the juvenile offense structure, but rather promoting its ultimate purpose of accuracy in the factfinding process.
It is within the legislative domain to prohibit juvenile conduct conducive to future criminality. The Legislature may pass laws designed to protect minor children against a life of delinquency and determine in its wisdom what activities involve danger that a child will become a hazard either to himself or to society. State v. Monahan, 1954, 15 N.J. 34, 104 A. 2d 21. The State may, to protect its interest in the proper operation, control and discipline of the family unit, pass legislation tending to insure the existence of harmonious relations between family members, and between the family unit and the rest of the public society, to the extent of making it a crime or a juvenile offense for juveniles persistently to disobey reasonable and lawful parental commands. See, Commonwealth v. Brasher, 1971, Mass., 270 N. E.2d 389. But, all such laws, designed to suppress crime in the future through preventive conviction and incarceration in the case of adults or preventive adjudication of delinquency and wardship when juveniles are involved, as desirable as they may be to combat crime or juvenile delinquency, cannot be achieved through techniques that trample on constitutional rights. See, Ricks v. District of Columbia, 1968, 134 U.S.App.D.C. 201, 414 F.2d 1097 at pages 1109, 1110; also cases cited at footnote 79 therein. The rule of law implies equality and justice in application which cannot exist when legislation provides no reasonable standard to determine prohibited conduct.
Some courts have said that in a sphere so vital to the community as the welfare of its youth, the use of words of general meaning in a statute designed to enable the Legislature to come to grips effectively with the problem of juvenile delinquency should be upheld where their frequent use in penal statutes gives assurance that they are understood by men of ordinary intelligence, or that terms such as general welfare, health, peace, morals and safety of the people, and sense of decency have a well-accepted and understood meaning. E. S. G. v. State, 1969, Tex.Civ.App., 447 S. W.2d 225; Lowe v. Texas Liquor Control Board, 1952, Tex.Civ.App., 255 S.W.2d 252; People v. Deibert, 1953, 117 Cal.App. 2d 410, 256 P.2d 355. Such assumptions, contrary to factual reality, are non-persuasive.
*578 The pre-Gault rationale of the Connecticut Court approved in State v. Mattiello, 1966, 4 Conn.Cir. 55, 225 A.2d 507, and in cases from other courts cited therein, to the effect that "[t]o save a child from becoming a criminal, or from continuing in a career of crime, to end in maturer years in public punishment and disgrace, the Legislature surely may provide for the salvation of such a child, if its parents or guardian be unable or unwilling to do so, by bringing it into one of the courts of the state without any process at all, for the purpose of subjecting it to the state's guardianship and protection," has been fully discredited by the trilogy of Gault, Winship and McKeiver.
As stated in Richards v. Thurston, 1970, 1 Cir., 424 F.2d 1281, I believe that the Due Process Clause of the Fourteenth Amendment establishes a sphere of personal liberty for every individual, and this includes juveniles, subject to reasonable intrusions by the State in furtherance of legitimate state interests. A juvenile has a constitutional right to freedom from being state institutionalized except for justifiable state action in furtherance of a legitimate public interest but, even then, the State's exercise of power must be energized, and deployed within proper constitutional strictures, one of which is that the statute defining the State's right to interfere must provide reasonable standards to guarantee against arbitrary and unequal application of the law.
True, there is a presumption of constitutionality of great strength in favor of all acts of the Legislature. State v. Fantastic Fair and Karmil Merchandising Corp., 1961, 158 Me. 450, 186 A.2d 352; Look v. State, 1970, Me., 267 A.2d 907. It is a well settled rule of construction that, if a statute is susceptible of two interpretations, and one of the interpretations will render the statute unconstitutional and the other will not, the latter should be adopted. State v. Intoxicating Liquors, 1888, 80 Me. 57, 12 A. 794. The presumption and the rule of construction are based on the judicial assumption that the Legislature acted with knowledge of constitutional restrictions, and that the Legislature honestly believed that it was acting within its rights, duties and powers when it passed the legislation. Baxter v. Waterville Sewerage District, 1951, 146 Me. 211, 214, 79 A.2d 585. But the Court's ultimate duty is to determine legislative intent. It is not concerned with the consequences of statutory provisions. The Court must interpret and not make the law. Farris, ex rel. Dorsky v. Goss, 1948, 143 Me. 227, 60 A.2d 908.
The concept of juveniles found "living in circumstances of manifest danger of falling into habits of vice or immorality" is not of recent vintage. The Legislature made it the basis for civil commitment of young girls to the Maine Industrial School for Girls under Public Laws, 1873, chapter 141. The Legislature then also permitted State wardship for young girls "leading an idle, vagrant or vicious life." We must, therefore, approach the construction of the reference statute having in mind that the Legislature was thinking in terms of modes of life in juveniles mostly characterized by idleness and vagrancy which were then philosophically considered fertile soil of future criminality. Far from the minds of our Legislators was the modern precision of constitutional due process espoused by the Gault, Winship and McKeiver decisions.
The reference section of the Juvenile Act is so vague that it affords an almost boundless area for individual subjective assessment of a child's behavior as the test for determination of prohibited juvenile conduct. In the instant case, where the offensive conduct is not before us, First Amendment rights may be involved and the statute as written is subject to unconstitutional overbreadth. To a great portion of the people of this State, juveniles participating in demonstrations are living in circumstances of manifest danger of falling into habits of vice or immorality. By reason of its constitutional overbreadth in the area of First Amendment rights, this *579 Court should outlaw this offensive section of the statute. When a legislative act is so clearly, manifestly and irreconcilably conflicting with the constitution by any reasonable construction, this Court has no alternative than to declare it invalid in fulfillment of its own imperative and unceasing obligation to support the constitution. State v. Butler, 1909, 105 Me. 91, 73 A. 560. A statute which may sweep within its broad scope activities constitutionally protected by the First Amendment must be stricken down as unconstitutional. Cox v. State of Louisiana, 1965, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471.
For this Court to narrow the meaning of the Act beyond any reasonable belief of factual legislative intent smacks of judicial legislation rather than judicial construction. I am satisfied that the Legislature is fully capable of delineating with reasonable precision the type of activity which it considers likely to develop habits of undesired social misconduct in juveniles. The youth of this State are entitled to know what conduct will jeopardize their right to live at home and force them into a State institution. The application of due process requirements to the statute defining juvenile offenses will in no way affect the informality, flexibility, or speed of the juvenile hearing, except that it will protect the child against the uncontrolled subjective discretion of well-meaning officials. Instead of being disruptive of the juvenile process, compliance with fair notice requirements will advance the basic philosophy, idealism and purposes of the system.
It is conceded that the language of the statute  "habits of vice or immorality" , when used in their unbridled connotation, fails to meet that degree of specificity which due process enjoins on legislative enactments purporting to regulate conduct the violation of which subjects the individual to the loss of his liberties. Indeed, "vice", according to Webster's Dictionary, is defined as a moral fault or failing, especially immoral conduct or habit, as in the indulgence of degrading appetites, such as the vice of gluttony; other meanings include the state of being given up to evil conduct or habit, depravity, wickedness and corruption. "Immorality", on the other hand, is stated to be vice, wickedness, especially unchastity or an immoral act or practice. The concept of morality, and the same would be true of its near-synonym "vice", has occupied men of extraordinary intelligence for centuries, without notable progress (among even philosophers and theologians) toward a common understanding. Certainly, the present generation has a much different conception of the term from that entertained by past generations. A legislative directive addressed to children couched in terms so broad that men of extraordinary intelligence cannot agree as to meaning must perforce be constitutionally deficient for vagueness.
By judicial fiat, 15 M.R.S.A. § 2552 is interpreted as if it read:
"The exclusive, original jurisdiction of juvenile courts shall include all offenses committed by juveniles and the following conduct of juveniles: * * *;
"conduct of the juvenile while living in circumstances which make it clear that if such conduct is continued, there is manifest danger of falling into habits of criminal conduct . . . ."
It is also defined as a pattern of conduct which manifests or makes clear to all reasonable men that if persisted in and not changed, there is real danger that the conduct will, when the child becomes an adult, bring about violation of the criminal statutes.
Such a definition creates as much confusion and ambiguity as it attempts to resolve. First, it seems to require proof of active conduct, whether of commission or omission, not of a criminal nature in itself  (Violation of any criminal statute is a juvenile offense). Secondly, the conduct need not be misconduct  (eating as a glutton might be precursory to a life of thievery). Thirdly, there must be more than *580 one act or omission, since the definition speaks of a pattern of conduct. Fourthly, the repeated conduct must be of such a nature that all reasonable men would conclude that if persisted in and not changed, there would exist a real danger when the child becomes an adult (in the near or distant future depending on the age of the child at the time) that because of such conduct he will violate the criminal laws. The new definition fails to delineate with sufficient precision the nature of the conduct which will activate the statute. The standards set up are so encompassing as to encourage arbitrary and discriminatory enforcement of the law and to force compliance with different life-styles deemed appropriate by the respective judges before whom the juvenile may be compelled to appear.
In its effort to prevent future criminality, the State can formulate legislation more compatible with our constitutional concepts of fundamental fair treatment which permits equal justice to the poor as well as to the rich, to the less fortunate as to the well oriented, to the troublesome as to the most docile juveniles.
The new definition does not limit the application of the statute to any reasonably identifiable situation. Where the statute may impinge upon First Amendment rights, it should be strictly construed. Its vagueness, or overbreadth, stamps it unconstitutional under the "void for vagueness" doctrine and little or no effort should be made to save such a statute by narrowing its application. State v. Hodges, 1969, Or., 457 P.2d 491; Thornhill v. Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093.
On the merits, I would declare the section of the statute at issue unconstitutional and would set aside the original adjudication of a juvenile offense in each case and order the respective petitioners released from their commitment and detention under it, since I conclude it gives insufficient notice to youth as to the reach of the law, provides law enforcement officers with no clear guide for evaluation of prohibited juvenile conduct, and offers the judge inadequate standards for inclusion and exclusion in the dispensation of even justice. It is impermissibly vague.
NOTES
[1] To the extent that this language may be interpreted as categorically denying the juvenile all due process protection as he proceeds through the juvenile system, it has clearly been discredited by the subsequent development of the 14th Amendment. The due process clause undebatably affords procedural protection in many non-criminal proceedings, juvenile proceedings among them; the modern dispute focuses on the nature rather than the applicability of that protection. Moreover, the parallel between the role of the natural parent and that of the state as parens patriae is overdrawn by this court; the State's power to deal with the juvenile is subject to the restrictions of the 14th Amendment, whereas the parent's is not.
[2] The attitudes of the Court in O'Connell were effectively discarded in In re Ferrier, 103 Ill. 367, 42 Am.Rep. 10 (1882).
[3] See for example McKeiver v. Pennsylvania: Juries and Juveniles  Parens Patriae Revived, 5 Indiana Legal Forum 197 (Fall 1971).
[4] We recognize a statute couched in these terms presents danger of overbroad application. Even though as we have pointed out the core meaning describes a comprehensive normative standard, though imprecise at the periphery, there is danger that the complainant or the juvenile judge might attempt to apply his own particular moral standards or to force lifestyle or physical appearance into a mold he considers acceptable. In short, statutes framed as imprecisely as this appears to be, do create possibilities of attempted overbroad application. We are here faced, however, with a facial attack on the statute not an "as applied" attack. See United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). See also Coates v. Cincinnati, supra.

"Although a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, he is permitted to raise its vagueness or unconstitutional overbreadth as applied to others. And if the law is found deficient in one of these respects, it may not be applied to him either, until and unless a satisfactory limiting construction is placed on the statute. . . . The statute, in effect, is stricken down on its face. This result is deemed justified since the otherwise continued existence of the statute in unnarrowed form would tend to suppress constitutionally protected rights." 402 U.S. at 619, 91 S.Ct. at 1691 (White, J., dissenting) (1971). Mr. Justice White would permit an overbreadth attack to be made even though the "as applied" application presents no vagueness issue when the statute at issue purports to regulate or proscribe rights of speech or press protected by the First Amendment. See opinion of Coffin, C. J., in Goguen v. Smith, 471 F.2d 88 (1st Cir. 1972).
[5] There is no claim by these petitioners that the statement of facts in these cases (not found in this record) were insufficient to give them adequate notice of the conduct which the State contended constituted the commission of the juvenile offenses.
[6] A theme of paternalism and benign motivation permeates the history and present posture of the juvenile system. This requires special comment of a cautionary nature. It is not the motivation of the State in this area which justifies the application of non-criminal standards of due process, but it is, rather, recognition of the Legislature's right to establish a separate and non-criminal system for juveniles. The Court is not and must not be beguiled by the commendable intentions of the State but must, because of them, all the more diligently scrutinize the separate system established to insure that it contains the safeguards necessary to protect the rights of the individual juvenile from abuse. As Justice Brandeis said, dissenting in Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1927) "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficient . . . . The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." A similar idea was expressed by two dissenting justices in Wyman v. James, 400 U.S. 309, 343, 91 S.Ct. 381, 400, 27 L.Ed.2d 408 (1971). (Marshall and Brennan, JJ., dissenting): "A paternalistic notion that a complaining citizen's constitutional rights can be violated so long as the State is somehow helping him is alien to our Nation's philosophy." These words of caution must be considered in evaluating the holding in the instant case and in dealing with future problems which arise out of the juvenile system.
[1] Haley v. Ohio, 1948, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; Gallegos v. Colorado, 1962, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325; Kent v. United States, 1966, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84; In re Gault, 1967, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527; De Backer v. Brainard, 1969, 396 U.S. 28, 90 S.Ct. 163, 24 L.Ed.2d 148; In re Winship, 1970, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368.